2016 IL App (1st) 141597

FIRST DIVISION
December 29, 2016

No. 1-14-1597

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 21296 |
| | ) | |
| JORDON PARKER, | ) | Honorable |
| | ) | Noreen Valeria Love, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Harris and Justice Simon concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Jordan Parker was convicted of two counts of criminal sexual assault and sentenced to a total of eight years in prison. The State's case against Mr. Parker rested on the testimony of the complainant, A.T., who testified that, on the evening of July 23, 2009, she was 18 years old and had been in a dating relationship with Mr. Parker, who was then 19 years old. They had dated for just under two months when she met him at a park near her home. A.T. testified that, while the two were in the backseat of Mr. Parker's vehicle, despite her protestations, Mr. Parker proceeded to remove her clothing and force her to submit to oral and anal sexual contact before finally giving her clothing back and allowing her to leave the vehicle.

¶ 2    Mr. Parker raises four issues on appeal. He argues that his convictions should be reversed both because no rational trier of fact could have accepted A.T.'s uncorroborated and improbable account of events to find him guilty beyond a reasonable doubt and because he did not knowingly and intelligently waive his right to a jury trial. Mr. Parker additionally argues that, as applied to him, the Sex Offender Registration Act (see 730 ILCS 150/1 *et seq.* (West 2012)) and related statutes are punitive in effect and violate both the eighth amendment's prohibition on cruel and unusual punishment and the proportionate penalties clause of the Illinois Constitution. Finally, Mr. Parker argues that the Sex Offender Registration Act is facially unconstitutional because it violates registrants' substantive and procedural due process rights. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4    Jordon Parker was charged with multiple counts each of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2008)) and criminal sexual abuse (720 ILCS 5/12-15(a)(1) (West 2008)) based on the State's allegations that on July 23, 2009, Mr. Parker forcibly penetrated or made sexual contact with the vagina and anus of A.T., the complainant.

¶ 5    Mr. Parker's defense attorney requested a bench trial and one was held on September 27, 2013. Before trial, the court stated: "I need the charging document. *** Now, I need a Jury waiver, if that has not been previously done." The following exchange then took place:

"THE COURT: *** Sir, I have here what is known as a

Jury waiver. Is that your signature?

THE DEFENDANT: Yes, ma'am.

THE COURT: By signing that you give up the right to have

a trial by Jury. Do you know what a Jury trial is?

THE DEFENDANT: Yes."

¶ 6   At trial, A.T. testified that, when she met Mr. Parker in May 2009, she was 18 years old, had recently graduated from Oak Park River Forest High School, and lived with her parents. A.T. stated that she met Mr. Parker on May 30, 2009, when she stopped at a gas station where he was selling CDs. She purchased a CD from Mr. Parker, who asked if A.T. was single and included his phone number on the face of the CD. The next day, A.T. called Mr. Parker. A.T. and Mr. Parker began dating and A.T. stated that between June and July 2009 they called and sent text messages to each other and met on three occasions.

¶ 7   A.T. further testified that, on July 23, 2009, she and Mr. Parker made plans to meet in the parking lot of Oak Park River Forest High School. A.T. rode her bicycle to the high school and Mr. Parker arrived in his white Ford Explorer. A.T. got into Mr. Parker's vehicle and they talked for approximately 45 minutes. At around 5:30 p.m., A.T. and Mr. Parker left the parking lot to go to a park near Fenwick High School, which was close to A.T.'s house; A.T. road her bicycle and Mr. Parker drove his vehicle. Once they reached the park, A.T. parked her bicycle next to Mr. Parker's Ford Explorer and they both entered the backseat of the vehicle.

¶ 8   According to A.T., the two talked for a few minutes and then began kissing. Mr. Parker then attempted to remove A.T.'s clothing and A.T. told him no. She testified that the two went "back and forth," with A.T. trying to keep her clothing on and Mr. Parker trying to remove it, until he succeeded in removing her shorts. When asked to describe their exchange, A.T. stated: "I said stop. No. I don't want to. He said let me do it." A.T. testified that she continued to resist Mr. Parker's efforts but after five or ten minutes he succeeded in removing her clothing and

underwear.

¶ 9    A.T. testified that, at this point, Mr. Parker asked if she would have oral sex with him and she said no. For another five minutes A.T. stated Mr. Parker kept trying to convince her and she kept saying no, until finally he forced her to allow him to perform oral sex on her. When asked specifically what Mr. Parker did to force her, A.T. stated "I was still on the back seat sitting in the back seat of the car, and he was on the floor. And he forced me to let him perform it on me." A.T. testified that she then started crying and asked Mr. Parker to stop but that he continued for a few minutes and stopped only "when he felt like it." Mr. Parker then asked A.T. why she was crying, and A.T. responded that she was uncomfortable, he was making her do things she did not want to do, and she was scared.

¶ 10    A.T. stated that Mr. Parker then asked her to perform oral sex on him and A.T. said no. He then laid A.T. horizontally across the backseat of the vehicle and she screamed. A.T. stated that Mr. Parker reacted with surprise, asking her if she thought he planned to rape her, and A.T. responded "yes." Mr. Parker allowed A.T. to sit back up but continued to ask her to have sex with him for about five or ten minutes while she cried and told him no.

¶ 11    A.T. testified that she then decided to lie to Mr. Parker, telling him that she was raped by a family member when she was a child, because she thought he might stop pressuring her for sex. Mr. Parker said "ok" but, less than five minutes later, pulled A.T. onto his lap. A.T. testified that she attempted to cover herself with a towel and felt pain in her behind. She told Mr. Parker to stop, and he responded by telling her that he was wearing protection. A.T. looked down and saw that Mr. Parker's penis was inside her anus. She did not see a condom. A.T. testified that she tried to get off of Mr. Parker and that she hit him on the side of his head, causing him to say

"don't do that." A.T. further testified that she was scared and she did not want to make Mr. Parker angry because she "thought he might do something else."

¶ 12     A.T. testified that she was crying after she got off of Mr. Parker's lap and Mr. Parker told her "it's fine and it's okay. Stop crying." A.T. told Mr. Parker that it was late and she wanted to go home but he would not give her back her clothing and the doors of the vehicle were locked. A.T. recalled that she was unable to find her underwear and Mr. Parker told her that they were "lost or [he was] going to keep them or something." According to A.T., while she put on the rest of her clothes Mr. Parker took pictures of her on his phone. When A.T. got out of the car, Mr. Parker attempted to give her a hug, but she refused.

¶ 13     A.T. testified that it was then approximately 8:15 p.m. She rode her bike home, went to her room, and sent a text message to her friend about the encounter. At around 8:45 p.m., Mr. Parker called her to see if she had made it home safely. A.T. testified that she saw Mr. Parker's phone number on her caller ID but answered the phone anyway because she "wanted to know what he was going to say." Later that evening, A.T. placed her clothes in a plastic bag and put them in her closet. She considered telling the police and her parents but did not because she felt scared. A.T. testified that she spoke to Mr. Parker again "a couple of days after or the next couple of weeks" and they "talked a little bit," at which point A.T. ended the relationship.

¶ 14     After approximately one month, A.T. told her parents what happened because she did not want Mr. Parker "to get away with it." The police came to A.T.'s house and she gave them the CD she purchased from Mr. Parker and the plastic bag containing her clothes.

¶ 15     On cross-examination, A.T acknowledged that on the evening in question Mr. Parker never told her that she could not leave his vehicle, that one of the car windows was open but she

did not call for help, and that Mr. Parker did not rip or tear her clothing. A.T. testified, however, that she kicked at Mr. Parker and scratched him on his arms. She stated that they were both pulling on her clothing and he simply pulled harder. A.T. also agreed that she received a text message from her parents telling her to come home at about the time she retrieved her clothing and headed home.

¶ 16    Officer Troy Fields testified that he responded to A.T.'s report of sexual assault and received the bag of clothes on August 24, 2009.

¶ 17    Jamie Jett, a forensic scientist at the Illinois State Police crime lab, found no hairs, fibers, or debris on the clothing and no traces of semen on either the clothing or in Mr. Parker's vehicle.

¶ 18    Officer Seth DeYoung testified that on August 26, 2009, he interviewed A.T. in the presence of her mother at the River Forest police station. According to Officer DeYoung, A.T. did not tell him that she kicked or scratched Mr. Parker but did tell him that she struck Mr. Parker in the head when he put his penis in her anus. A.T. did not tell Officer DeYoung that the doors of Mr. Parker's vehicle were locked or that he told her she could not exit the vehicle. Officer DeYoung testified that he arrested Mr. Parker on September 1, 2009, and searched his Ford Explorer, finding no forensic evidence. Officer DeYoung stated that he found a photograph of A.T. on Mr. Parker's cell phone; the parties stipulated, however, that no photographs of A.T. were exchanged during discovery.

¶ 19    At the conclusion of the bench trial, the circuit court found Mr. Parker guilty of three counts of criminal sexual assault and three counts of criminal sexual abuse. This included all charges that alleged contact between Mr. Parker's mouth and A.T.'s vagina and contact between Mr. Parker's penis and A.T.'s anus. The court merged all six counts into two convictions for

criminal sexual assault and sentenced Mr. Parker to the minimum four years for each count, for a total of eight years in prison.

¶ 20    In reaching its decision, the circuit court found A.T.'s testimony to be credible:

"I believe her testimony. I believe she was credible on the stand. She certainly was in tears here when she recalled some of the events that took place. She spoke to police officers; and as she, again, recounted those events, she was in tears concerning what had occurred. And I do believe that that was sufficient."

¶ 21    The court also noted that there was no evidence establishing a motive for A.T. to be untruthful about what took place between her and Mr. Parker:

"And I have to ask myself what would be the point in her a month later coming back and saying that he forced her to participate in sexual conduct if it was a consensual act? What would be her motive a month later to say no, he actually forced me to do this? I don't understand. I mean, if it was a situation where there was testimony that he somehow broke it off and she's a woman scorned, I might understand that."

¶ 22    Finally, the circuit court concluded that A.T.'s testimony was consistent both with the fact that she saved her clothing from the night in question in a plastic bag and with Officer DeYoung's testimony that a photograph of A.T. was later found on Mr. Parker's cell phone, although the photograph itself was not collected or presented at trial.

¶ 23                                JURISDICTION

¶ 24    Mr. Parker was sentenced by the circuit court on May 30, 2014, and timely filed his notice of appeal on June 2, 2014. Accordingly, this court has jurisdiction pursuant to article VI,

section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case. (Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013)).

¶ 25                                    ANALYSIS

¶ 26    On appeal, Mr. Parker presents two arguments in support of reversal of his convictions for criminal sexual assault—insufficiency of the evidence and an invalid jury waiver—and makes both an as applied and a facial constitutional challenge to the Sex Offender Registration Act and related statutes, which he is subject to as a collateral consequence of his convictions. We address each argument in turn.

¶ 27                          I. Sufficiency of the Evidence

¶ 28    Mr. Parker first argues that the evidence presented at his trial was insufficient to support a finding of his guilt because it consisted solely of A.T.'s testimony, which he contends no rational trier of fact could have believed considering the absence of any corroborating physical evidence, inconsistencies with her prior statements, and the implausibility of her account. The State counters that reversal is not warranted where the circuit court expressly found A.T. to be a credible witness whose testimony was consistent with the testimony of police officers.

¶ 29    When, as here, a criminal defendant challenges the sufficiency of the evidence that resulted in his conviction, our function is not to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, "after viewing the evidence in the light most favorable to the prosecution," we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Id.* We will not overturn a criminal conviction on review "unless the evidence is so improbable or

unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Schott*, 145 Ill. 2d 188, 203 (1991). We afford great deference to the circuit court's assessment of a witness's credibility because "the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). However, that deference does not extend to testimony that is "so lacking in credibility that a reasonable doubt of defendant's guilt remains." *Schott*, 145 Ill. 2d at 207. Thus, a conviction based upon testimony that is "improbable, unconvincing, and contrary to human experience requires reversal." *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992). Finally, it has been clear since our supreme court's decision in *Schott* that the State has no added burden in a sexual assault case to demonstrate that the complainant's testimony is either substantially corroborated or strong enough to meet a clear and convincing evidentiary burden; like any other criminal case, the State need only prove the defendant's guilt beyond a reasonable doubt. *Schott*, 145 Ill. 2d at 202-03.

¶ 30    Based on this last authority, we must first reject Mr. Parker's argument that a lack of physical or medical evidence presented by the State supports reversal in this case. *Schott* makes clear that the State need not demonstrate that physical evidence substantially corroborates a complainant's testimony. *Id.* We furthermore do not find that the absence of physical evidence in this case renders A.T.'s account "improbable, unconvincing, [or] contrary to human experience," such that it would preclude a reasonable fact finder from accepting her testimony. *Vasquez*, 233 Ill. App. 3d at 527. A.T. never testified or reported to police that Mr. Parker ejaculated, which might have created an inconsistent story since no semen was found on her clothing or in Mr. Parker's vehicle (even assuming that traces of semen would have still been present when police

searched the vehicle approximately one month after the incident). Nor is A.T.'s testimony that she experienced pain when Mr. Parker penetrated her anus with his penis necessarily contradicted by the absence of blood on her clothing or the backseat of the vehicle. A.T.'s description of a back and forth struggle while Mr. Parker attempted to remove her clothing is furthermore not inconsistent with the fact that her clothes were not torn.

¶ 31    Mr. Parker cites *People v. Rivera*, 2011 IL App (2d) 091060, and *People v. Green*, 140 Ill. App. 3d 35 (1986), to support his argument that the lack of corroborating physical evidence requires reversal. *Rivera* is quite different because in that case DNA testing positively *excluded* the defendant as the source of sperm found in the victim. *Rivera*, 2011 IL App (2d) 091060, ¶ 31. *Green* is inapplicable because it was decided under the old, pre-*Schott* standard requiring a complainant's testimony to be either "clear and convincing" or corroborated by other evidence. *Green*, 140 Ill. App. 3d at 40.

¶ 32    Mr. Parker also argues that A.T. offered inconsistent testimony that undermined her credibility. Mr. Parker points out that, although A.T. testified that she told Officer DeYoung both that she kicked and scratched Mr. Parker when he attempted to remove her clothing and that she was unable to leave his vehicle because the doors were locked, Officer Young stated that A.T. did not relay these facts to him. Mr. Parker also notes that, although on direct examination A.T. stated that she told Mr. Parker that she needed to leave because it was getting late and Mr. Parker refused to give back her clothes for ten minutes, on cross-examination A.T. stated that she received a text message telling her to come home and that Mr. Parker sat there while she dressed and left. The circuit court did not find that these statements impeached A.T.'s credibility and we conclude that, viewed in the light most favorable to the prosecution, they do not create such

inconsistency that no rational fact finder could find Mr. Parker guilty beyond a reasonable doubt.

¶ 33    Mr. Parker also argues that A.T.'s continued contact with him and failure to report the incident for a month made her story less credible. Again, although these circumstances may have affected A.T.'s credibility, they did not sufficiently undermine her testimony to require reversal. A.T.'s subsequent contact with Mr. Parker was limited. She testified that she answered his call later the same night simply to see what he would say and that, the next time they spoke, she communicated to him that their relationship was over. Courts have noted that delay in reporting sexual assault may be reasonable "where the victim's silence is attributed to fear, shame, guilt and embarrassment," and have refused to reject a complainant's testimony merely due to her delay in reporting the incident. *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993). Here, A.T. testified that she considered telling her parents and the police of the sexual assault right away but decided not to because she felt scared and that, upon reflection, she changed her mind because she did not want Mr. Parker to get away with what he had done to her. We do not find this explanation so illogical that it rendered A.T.'s testimony unbelievable.

¶ 34    Finally, Mr. Parker argues that A.T.'s testimony regarding the force she claimed he used against her during the assault was inherently unbelievable, contrary to human experience, and vague. According to Mr. Parker, it is simply not believable that, over the course of two or more hours in his vehicle, A.T. would not have ever called for help, even though one window was rolled down, or would not have tried to get away from him when he began to perform oral sex on her if the act was not consensual. Mr. Parker also finds it incredible that, after he purportedly pulled A.T. onto his lap to initiate anal sex, she stopped fighting back after hitting him only once in the head, especially when she testified that all he said was "don't do that" and she did not

testify that he used further physical force. Mr. Parker further argues that A.T.'s description of force was too vague to be believable when she testified that Mr. Parker "forced" her to allow him to perform oral sex but never explained the type of force that he used.

¶ 35   The use of force is an essential element of criminal sexual assault. *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 52 (noting that lack of consent alone is insufficient). Beyond the fact that the requisite force must be "something more than the force inherent in the sexual penetration itself," there is "no definite standard establishing the amount of force which the State is required to prove in order to prove criminal sexual assault, and each case must be considered on its own facts." (Internal quotation marks omitted.) *Id.* ¶¶ 52, 54. "If circumstances show resistance [would have] be[en] futile or life endangering or if the victim [wa]s overcome by superior strength or fear, then useless or foolhardy acts of resistance are not required." *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 33.

¶ 36   Here, A.T. testified that she resisted Mr. Parker's efforts to first remove her clothing, then cried and asked him to stop performing oral sex on her, but that he continued to do so for approximately ten minutes, only stopping "when he felt like it." It can reasonably be inferred from this testimony that physical resistance to Mr. Parker would have been futile.

¶ 37   A.T. further testified that she continued crying after the oral sex, told Mr. Parker that he was "making her do things she didn't want to," and that she was scared. She testified that when Mr. Parker then laid her horizontally across the backseat of the vehicle, she screamed, he asked her if she thought he planned to rape her, and she told him yes. Despite this exchange, A.T. testified that Mr. Parker then physically pulled her onto his lap, while she continued to protest, and put his penis in her anus. A.T. further testified that she hit Mr. Parker on the head and Mr.

Parker told her not to do that, which frightened her. This testimony, viewed in the light most favorable to the prosecution, again demonstrated that A.T. first resisted Mr. Parker's actions but that she felt further resistance would be futile.

¶ 38    We find the cases Mr. Parker relies on in which convictions were overturned based on insufficient evidence to be distinguishable. In *People v. Herman*, 407 Ill. App. 3d 688, 704-05 (2011), the complainant, a confessed drug addict, testified that she was raped by a Chicago police officer. The defendant admitted to having sex with the complainant but insisted that the act was consensual and took place when he was not on duty. *Id.* at 689. According to the complainant, after smoking 6-8 rocks of cocaine she was induced by the defendant to go with him in his squad car to her home, where he sexually assaulted her; when she reported the incident, she claimed she was belittled by the police officers, offered bribes of alcohol and money to go away, and made to participate in a reenactment of the assault in which her attorney took photographs. *Id.* at 704-05. The complainant also changed her timeline of events numerous times before and during trial, in some cases stating that the encounter occurred when the defendant could not have been at her apartment. *Id.* at 705-06. Unlike the complainant in *Herman*, A.T.'s testimony in this case was not so "fraught with inconsistencies and contradictions" that it was "impossible for any fact finder reasonably to accept any part of it." *Id.* at 705, 709.

¶ 39    And although *Vasquez*, 233 Ill. App. 3d at 527, also involved an alleged sexual assault that occurred in a vehicle, the complaint in that case testified both that he did not try to leave even when the defendant exited the car to urinate and that he did not believe the defendant intended to harm him. Moreover, the complainant in that case agreed that he himself suggested

the two meet again in a tunnel or viaduct where, after another alleged assault occurred, he sought no assistance from individuals who interrupted the sex act when they approached the viaduct. *Id.* at 528. The court concluded that resistance, far from being futile, would likely have been successful. *Id.* The facts of this case simply do not give rise to such an inference. Moreover, the complainant in *Vasquez* had a motive to fabricate; he only reported the incident after the defendant left a letter at the complainant's foster home and the foster parents called the police. *Id.* at 521, 528. As the circuit court in this case noted, A.T. had no such motive.

¶ 40   Mr. Parker relies most heavily on *People v. Yeargan*, 229 Ill. App. 3d 219, 227, 230, 232-33 (1992), which he argues is comparable to this case because, like the complainant in *Yeargan*, A.T.'s clothing was not ripped, she did not exhibit signs of physical abuse, no semen was present on her clothes, and she never cried out for help. In *Yeargan*, however, the complainant described a more violent encounter, alleging that the two defendants physically grabbed her by the arms, took her down a dark alley and into a nearby garage, forcibly removed her clothing, and took turns sexually assaulting her, each ejaculating multiple times. *Yeargan*, 229 Ill. App. 3d at 221-22. The absence of physical evidence conflicted with the complainant's story in a way that it simply does not here.

¶ 41   It also bears noting that the court in *Yeargan* expressly acknowledged that it was making a credibility determination, on a cold record, in a case involving a witness with a mental disability, and that the circuit court "was in a much better position than [it] to view the evidence in light of [the] complainant's disability." *Id.* The court nevertheless held that the record as a whole undermined the complainant's credibility *so much* that no rational trier of fact could believe her version of events over that offered by the defendants. *Id.* This was a rare and

dramatic step that, if warranted in *Yeargan*, is plainly not warranted on the facts of this case.

¶ 42    We conclude that the State presented sufficient evidence from which a rational trier of fact could find Mr. Parker guilty beyond a reasonable doubt of both counts of criminal sexual assault. Viewed in the light most favorable to the prosecution, A.T.'s testimony alone is not so improbable, unconvincing, or contrary to human experience that no reasonable fact finder could have found her credible.

¶ 43                                II. Jury Waiver

¶ 44    Mr. Parker next contends that the circuit court erred by accepting his jury waiver without ensuring that it was knowingly, intelligently, and voluntarily made. The record reflects that the court asked Mr. Parker if it was his signature on the jury waiver, told him "[b]y signing that you give up the right to have a trial by Jury," and asked him whether he knew what a jury trial was, to which Mr. Parker responded "Yes." On appeal, Mr. Parker faults the court for failing to additionally "explain a jury trial or a bench trial, address whether [Mr.] Parker understood that he had a constitutional right to a jury trial, or explain the implications of waiving that right." Nor did the circuit court "ask [Mr.] Parker if any threats or promises had been made to obtain his jury waiver, or explain that it was [Mr.] Parker's choice, not his attorney's, to make." Mr. Parker additionally argues that, by stating that it "needed" a jury waiver before trial could begin, the circuit court treated his waiver as a foregone conclusion.

¶ 45    In response, the State argues that it can be inferred that Mr. Parker was made aware of his right to a jury trial as a result of his recent plea of guilty and efforts to withdraw that plea in connection with unrelated gun charges. The State also notes that, at no time during the bench trial and on no previous occasion when the impending bench trial was mentioned in open court

did Mr. Parker ever object. Finally, the State contends that, although Mr. Parker was 19 years old when the alleged sexual assault took place, by the time he waived his jury rights four years later, he was "a 23-year-old adult with a high school diploma."

¶ 46    Mr. Parker acknowledges that he did not raise this issue in the circuit court but argues that we may consider the claim as a matter of plain error. The plain error doctrine permits review of unpreserved error where the error is clear or obvious and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "th[e] error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Eppinger*, 2013 IL 114121, ¶ 18. We first determine whether an error occurred at all. *Id.* ¶ 19.

¶ 47    A criminal defendant has the constitutional right to a trial by jury (U.S. Const., amends. VI, XIV; Ill. Const. (1970), art. I, §§ 8, 13) but may knowingly and voluntarily waive that right (*People v. Bannister*, 232 Ill. 2d 52, 65 (2008)). "[A] defendant who challenges a jury waiver bears the burden of establishing that the waiver was invalid." *People v. Gibson*, 304 Ill. App. 3d 923, 929-30 (1999). Section 103-6 of the Code of Criminal Procedure of 1963 provides that, except for minor offenses only punishable by fines, a jury waiver is valid only where the right to a jury trial is "understandingly waived by defendant in open court." 725 ILCS 5/103-6 (West 2012). The circuit court has a duty to "ensur[e] that a defendant waives the right to a jury trial expressly and understandingly" but "need not give any specific admonition or advice" for a jury waiver to be valid. *Bannister*, 232 Ill. 2d at 66. A jury waiver's validity "cannot rest on any precise formula, but rather depends on the facts and circumstances of each particular case." *Id.*

Thus, although it is "preferable" for a circuit court to apprise a defendant of the right to a jury trial, it is not constitutionally required. *People v. Rincon*, 387 Ill. App. 3d 708, 718 (2008). Reviewing courts may consider both "a defendant's prior interactions with the justice system" and his "silence while his *** attorney requests a bench trial." *People v. Reed*, 2016 IL App (1st) 140498, ¶¶ 6-7. Furthermore, although a written jury waiver "memorializes the defendant's decision" (*Bannister*, 232 Ill. 2d at 66), the absence of such a writing may be harmless error and the presence of one, on its own, is insufficient to establish that a waiver is valid (*Rincon*, 387 Ill. App. 3d at 718). "[T]he pivotal knowledge that the defendant must understand—with its attendant consequences—is that the facts of the case will be determined by a judge and not a jury." *Bannister*, 232 Ill. 2d at 69. Where, as here, the facts surrounding the waiver are not in dispute, whether a defendant knowingly, voluntarily, and intelligently waived his right to a jury trial is a legal question that we review *de novo*. *Id.* at 66.

¶ 48    We must initially reject the State's argument that Mr. Parker's knowledge of his right to a trial by jury may be inferred from his prior experience with the criminal justice system. While Mr. Parker was on bond pending trial in this case he was arrested on separate charges and pleaded guilty to aggravated unlawful use of a weapon. He later unsuccessfully sought to withdraw his plea when it became clear that he was ineligible for a boot camp program in lieu of incarceration. The State argues that "quality can overcome quantity" and posits that even though this was Mr. Parker's only other experience with the criminal justice system, "it can strongly be inferred" both that Mr. Parker "had significant conversations with counsel concerning the plea process and its consequences" and that he "was properly admonished about his jury rights during that plea." The State cites no authority in support of this argument. Moreover, the inferences it

suggests we draw are based solely on speculation as to what defense counsel or the court discussed with Mr. Parker in that case, which did not result in either a bench trial or a jury trial. More is required to infer that a defendant's prior experience with the criminal justice system familiarized him with his right to a trial by jury. See, *e.g.*, *Bannister*, 232 Ill. 2d at 71 (right to a jury trial was knowingly waived where the record included the report of proceedings for the defendant's previous trial on other crimes, which clearly demonstrated that he had been admonished regarding his right to a jury trial and chose a bench trial); *People v. Reed*, 2016 IL App (1st) 140498, ¶ 8 (right to jury trial was knowingly waived where the defendant was not only convicted of eight prior felonies and multiple misdemeanors, but had previously waived a jury trial on two occasions).

¶ 49    However, we must also reject Mr. Parker's contention that the circuit court treated the fact of his waiver as a foregone conclusion by stating that it "need[ed]" a jury waiver before the bench trial in this case could begin. The record indicates that, when she made the statement, the circuit court judge was addressing counsel to request copies of certain documents in the case. A bench trial had already been requested, scheduled, and discussed on the record numerous times in connection with various continuances, and Mr. Parker had already signed and filed his jury waiver. In this context, the circuit court's comment could not reasonably have been construed by Mr. Parker as a pronouncement that a signed jury waiver was required of him before the trial could begin.

¶ 50    In his remaining arguments, Mr. Parker essentially faults the circuit court for failing to make certain inquiries and admonishments discussed in *People v. Tooles*, 177 Ill. 2d 462, 470-73 (1997), including an explanation of the difference between a jury trial and a bench trial, a request

that the defendant explain this difference in his own words, emphasis on the defendant's constitutional right to a jury trial and the fact that a jury waiver is irrevocable, and confirmation that the defendant's waiver was made after consultation with counsel. Rather than holding that these were requirements for a valid jury waiver, however, our supreme court in that case confirmed that "no set admonition or advice is required" because validity "turns on the facts and circumstances of each particular case." *Id.* at 469. In each of the three cases consolidated in *Tooles*, there was no written jury waiver. *Id.* at 464. Although a written jury waiver alone is not sufficient to demonstrate a knowing, intelligent, and voluntary waiver, compliance with this statutory requirement weighs in favor of such a finding. *Bannister*, 232 Ill. 2d at 66; *Rincon*, 387 Ill. App. 3d at 718. The court in *Tooles* was not called upon to decide what admonishments or inquiries would be sufficient where, as here, a written jury waiver is present.

¶ 51   Mr. Parker further argues that his exchange with the circuit court resembles the one found insufficient in *People v. Sebag*, 110 Ill. App. 3d 821 (1982), a case that did involve a written jury waiver. There, the circuit court told the defendant "You are entitled to have your case tried before a jury or judge" and the defendant responded "Judge." (Internal quotation marks omitted.) *Id.* at 828-29. The circuit court then said, "[d]o you understand that by waiving a jury at this time that you cannot reinstate it[?]" to which the defendant replied "Yes." (Internal quotation marks omitted.) *Id.* The appellate court concluded that, under the circumstances, this exchange was not sufficient to ensure a knowing, intelligent, and voluntary waiver. *Id.* It noted that "[t]he defendant was without benefit of counsel, and it d[id] not appear that he was advised of the meaning of a trial by jury nor d[id] it appear that he was familiar with criminal proceedings." *Id.* Importantly, although the defendant was charged with both battery and public indecency, the

circuit court's discussion with him about his jury waiver took place only in the context of his battery charge. *Id.* The appellate court concluded that, "[t]aken as a whole," the record did not establish a valid waiver of the defendant's right to a jury trial on the charge of public indecency. *Id.* In contrast, Mr. Parker was represented by counsel and there is no indication in the record that the discussion regarding his jury waiver related to only a portion of the case against him.

¶ 52    Other cases cited by Mr. Parker are similarly distinguishable on their facts. See *People v. Phuong*, 287 Ill. App. 3d 988, 995-96 (1997) (holding that a jury waiver was invalid where, although the defendant signed a translated jury waiver form, she was a Chinese speaker who had only recently immigrated to this country and it was unclear whether she understood what a jury was); *People v. Murff*, 69 Ill. App. 3d 560, 564 (1979) (holding that a jury waiver was invalid where the defendant, who was receiving psychiatric treatment, gave a nonresponsive answer when asked by the circuit court if he understood what a jury trial was).

¶ 53    We conclude that Mr. Parker's jury waiver was valid. The record in this case demonstrates that Mr. Parker was made aware of his right to a jury trial. His signed jury waiver and affirmation in open court show that he knowingly and voluntarily waived that right. Having found no error, there can be no plain error. *People v. Calhoun*, 404 Ill. App. 3d 362, 382 (2010).

¶ 54                    III. Constitutionality of the Sex Offender Registry Act

¶ 55    Mr. Parker's convictions for criminal sexual assault require that he register as a "sexual predator" under the Illinois Sex Offender Registry Act (SORA) (730 ILCS 150/2(E)(1) (West 2012)). Mr. Parker argues that this classification, and the lifetime in-person reporting requirements and other restrictions that it imposes on him without regard for his rehabilitative potential, is unconstitutional. Mr. Parker insists that, as applied to him—a 19-year-old at the time

of the assault, whom the circuit court described at sentencing as "not a bad young man" but someone who "lost control of a situation"—the reporting requirements and restrictions set out in SORA and other related statutes applicable to sex offenders (collectively the SORA Statutory Scheme) constitute cruel and unusual punishment in violation of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and are disproportionate to the severity of his crime in violation of article I, section 11, of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Mr. Parker additionally asserts that SORA is facially unconstitutional because it violates the procedural and substantive due process rights guaranteed by both the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) and article I, section 2 of the Illinois Constitution (Ill. Const. 1970, art. I, § 2).

¶ 56   The constitutionality of a statute is a question of law which we review *de novo* and which may be raised at any time. *People v. Robinson*, 2011 IL App (1st) 100078, ¶ 12. Statutes are afforded a presumption of constitutionality; we have an obligation to construe a statute in a manner that will uphold its constitutionality if reasonably possible. *People v. Molnar*, 222 Ill. 2d 495, 508 (2006). The burden is on the party challenging the validity of the statute to establish its constitutional infirmity. *Id.* at 509.

¶ 57                   A. Eighth Amendment and Proportionate Penalties Challenge

¶ 58                      1. Whether the SORA Statutory Scheme is Punitive

¶ 59   SORA "was passed by the General Assembly 'in response to concern over the proliferation of sex offenses against children.' " *People v. Cornelius*, 213 Ill. 2d 178, 194 (2004) (quoting *People v. Adams*, 144 Ill. 2d 381, 386 (1991)). "By requiring sex offenders to register with local law enforcement agencies, 'the legislature sought to create an additional method of

protection for children from the increasing incidence of sexual assault and sexual abuse.' " *Id.* (quoting *Adams*, 144 Ill. 2d at 387). Mr. Parker acknowledges that his as-applied eighth amendment and proportionate penalties challenge to the SORA Statutory Scheme depends on a finding that the legislation is punitive (*People ex rel. Birkett v. Konestki*, 233 Ill. 2d 185, 207 (2008)) and that the Illinois Supreme Court has previously upheld the constitutionality of earlier versions of the sex registration and notification statutes against constitutional challenges (see, *e.g.*, *Cornelius*, 213 Ill. 2d 178; *People v. Malchow*, 193 Ill. 2d 413 (2000); *Adams*, 144 Ill. 2d 381). Mr. Parker's argument is based on what he refers to as the "2014 version of SORA," which includes substantive amendments to the SORA Statutory Scheme passed by the legislature over the years since *Cornelius* was decided in 2004.

¶ 60 There can be no dispute that the current version of the SORA Statutory Scheme has become "more onerous with regard to the amount of information a sex offender must disclose, the number of agencies to which the offender must disclose that information, and how often a sex offender must register." *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶ 51, *appeal denied*, No. 120381 (Ill. Mar. 30, 2016). Mr. Parker is required to register in person with law enforcement within three days of his release from prison and to provide and update a long list of documents and information, including his photograph, current address, employer, school, e-mail addresses, Internet identities, registered URLs, signed terms and conditions of his parole or release, information about his qualifying offense, license plate numbers of any vehicles registered to him, telephone numbers, and any distinguishing marks on his body. 730 ILCS 150/3(a), (c)(4) (West 2012). For the rest of his life, Mr. Parker will need to register with and provide an itinerary to law enforcement agencies in any municipality or county where he will be

temporarily domiciled for three or more days. 730 ILCS 150/3(a) (West 2012). He will also need to register with the security director of any institution of higher learning where he may attend or work. 730 ILCS 150/3(a)(2)(i), (ii) (West 2012). If Mr. Parker fails to comply with any of these or other mandatory reporting requirements, he may be convicted of a class 3 felony (730 ILCS 150/10(a) (West 2012)), carrying a sentence of up to five years in prison (730 ILCS 5/5-4.5-40(a) (West 2012)).

¶ 61    Certain provisions of the SORA Statutory Scheme furthermore "directly restrict where [a sex offender] can live, work, and even move about his [or her] community." *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 51. For example, Mr. Parker is prohibited from knowingly residing within 500 feet of a school that children under the age of 18 attend or within 500 feet of a playground or day care facility. 720 ILCS 5/11-9.3(b-5), (b-10) (West 2012). He cannot work at a county fair where children are present (720 ILCS 5/11-9.3(c-5) (West 2012)), work at a facility that "provid[es] programs or services exclusively directed toward persons under the age of 18" (720 ILCS 5/11-9.3(c) (West 2012)), drive a food or ice cream truck (720 ILCS 5/11-9.3(c-8) (West 2012)), or drive an ambulance or other emergency vehicle (*id.*). He cannot "participate in a holiday event" involving children under 18 years of age who are not his own children. 720 ILCS 5/11-9.3(c-2) (West 2012). Nor may he knowingly be present in or loiter within 500 feet of any public park. 720 ILCS 5/11-9.4-1(b) (West 2012). He is furthermore prohibited from changing his name (720 ILCS 5/21-101 (West 2012) and is required to renew his driver's license annually (720 ILCS 5/5-5-3(o) (West 2012)). The violation of any of these provisions is a Class 4 felony. 720 ILCS 5/11-9.3(f) (2012); 720 ILCS 5/11-9.4-1(d) (West 2012).

¶ 62    Mr. Parker does not contend that the General Assembly imposed these requirements and

restrictions with the goal of punishing sex offenders. Rather, it is his position that the additional burdens imposed by these and other amendments to the SORA Statutory Scheme are so significant that the statutes have become punitive, under the factors set out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), regardless of the legislature's intent.

¶ 63   We agree that the current statutory scheme goes far beyond the basic registration requirement first enacted in 1987. As our supreme court noted in *Adams*, 144 Ill. 2d at 388, "[a]part from the relatively simple act of complying, th[at] requirement [wa]s an innocuous duty compared to the potential alternative of spending an extended period of years in prison." The "disability imposed by the [law] f[ell] short of being severe" in significant part because the mere duty to register "impose[d] no restraints on liberty or property." *Id.* at 387-88. And in 2000, when the supreme court concluded in *Malchow*, 193 Ill. 2d at 421-24, that the overall effect of the Sex Offender and Child Murderer Community Notification Law (730 ILCS 152/101 *et seq.* (West 1998))—enacted in 1996 to operate in conjunction with the registration law—was not so punitive that it negated the legislature's intent to protect the public, it specifically noted that the law "d[id] not place an *affirmative* disability or restraint on sex offenders" (emphasis in original), their "movements and activities [we]re not restricted in any way," the law's provisions were not akin to traditional "stigmatization penalties like branding, stockading, pillaring, or banishment," and the reach of the law's provisions was "not excessive to achieve the legitimate purpose of protecting the public." The current SORA Statutory Scheme certainly does place affirmative disabilities and restraints on registrants by restricting their movements and activities. A punitive effect sufficient to negate the legislature's protective intent, however, must be founded upon " 'the clearest proof.' " *Malchow*, 193 Ill. 2d at 421 (quoting *Kansas v. Hendricks*, 521 U.S. 346,

361 (1997)). Deciding whether that burden is met is complicated by the fact that protection of the public and punishment of sex offenders are not mutually exclusive effects of the statutory scheme; in many instances stronger protection of the public imposes a heightened burden on registrants.

¶ 64    In his reply brief, Mr. Parker asks us to consider the very recent decision in *Does # 1-5 v. Snyder*, 834 F.3d 696, 705-06 (6th Cir. 2016), a case in which—in the context of a civil challenge to certain retroactive amendments—the Sixth Circuit concluded that Michigan's sex offender registration law had crossed the line from a civil regulatory statute to a law with punitive effects. The statute the court considered in *Does* bears many resemblances to the Illinois SORA Statutory Scheme: sex offenders must register in person quarterly or annually and provide a host of personal information that is then made available online; they cannot live, work, or loiter within 1000 feet of a school; and they are automatically divided into classifications, ostensibly based on their dangerousness to society, which are tied solely to the crimes they were convicted of, rather than to individual assessments. *Does*, 834 F. 3d at 697-98. The Sixth Circuit concluded that the Michigan legislature did not intend the law to be punitive but that, in contrast to a "more modest" Alaskan law held constitutional by the United States Supreme Court in *Smith v. Doe*, 538 U.S. 84, 92 (2003), the punitive effects of the Michigan law overrode the legislature's intent. *Does*, 834 F.3d at 701-06. The court observed that the law's geographical restrictions were "very burdensome, especially in densely populated areas," causing sex offenders great difficulty in finding places to legally live or work. *Id.* at 701-03. It furthermore concluded that the law— which sought to keep sex offenders away from opportunities to reoffend, looked back only to the offense in imposing its restrictions, and marked sex offenders as individuals who could not be

admitted into full society—"advance[d] all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence." *Id.* at 702-04. Recognizing the law's rational connection to a nonpunitive purpose, the court nevertheless cited empirical studies questioning the effectiveness of such laws as a means toward achieving that goal, noting that evidence suggests not only that offense-based public registration has no impact on recidivism, but that it may in fact *increase* recidivism by preventing sex offenders from getting and keeping jobs or finding housing. *Id.* at 704-05.

¶ 65    Although we agree that the Sixth Circuit's decision in *Does* is a thorough and persuasive analysis of Michigan's sex offender registration law that raises real areas of concern, it nevertheless concerns a different statutory scheme and is not binding on this court. We also note that the record in this case, in which the constitutional claim is raised in the context of a criminal appeal, simply does not contain the extensive demonstration—including maps visually depicting the effects of the Michigan law's geographical restrictions—that was relied on by the Sixth Circuit in *Does* to show the significant punitive effects of the Michigan law.

¶ 66    Turning to our own precedent, we note that the question of whether the current SORA Statutory Scheme has evolved to become primarily punitive in nature has recently been posed to this court on at least three recent occasions. The State urges us to follow *In re A.C.*, 2016 IL App (1st) 153047, ¶¶ 77-79, a juvenile delinquency case in which a panel of the First District of this court held that the evolution of the SORA Statutory Scheme reflects "social changes and [does] not manifest a punitive bent." Mr. Parker, however, argues that crucial differences between the provisions of the SORA Statutory Scheme applicable to adults as compared to juveniles make *A.C.* irrelevant to our analysis. In two recent cases involving adult offenders, panels of the First

and Fifth Districts of this court declined to decide whether the SORA Statutory Scheme has become punitive, finding the constitutional challenges raised by the defendants in those cases were deficient on other grounds. See *Avila-Briones*, 2015 IL App (1st) 132221; *People v. Pollard*, 2016 IL App (5th) 130514. We conclude that here, as in *Avila-Briones* and *Pollard*, it is ultimately unnecessary for us to reach this issue.

¶ 67                    B. Eighth Amendment and Proportionality

¶ 68    The essence of Mr. Parker's eighth amendment and proportionate penalties challenge is that the SORA Statutory Scheme's lifetime registration requirement "is particularly harsh and unconstitutionally disproportionate" as applied to him, an individual who was only 19 years old at the time of his offense and had only one other felony conviction for a nonviolent crime. Mr. Parker contends that his convictions for criminal sexual assault in this case were the result of a "misstep of taking things too far on [a] single occasion" for which he should not be penalized by living "a severely restricted existence for the rest of his life." Mr. Parker asks us to hold that the SORA Statutory Scheme does not apply to him or, alternatively, declare that its definition of a "sexual predator" (730 ILCS 150/7 (West 2014)) does not apply to him, which he contends would effectively reduce his term of registration and related restrictions to a period of ten years.

¶ 69    As our supreme court has recognized, "the legislature's discretion in setting criminal penalties is broad" and it "is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Constraining this discretion are the limits imposed by the eighth amendment of the United States Constitution, which prohibits the infliction of "cruel and unusual punishments" (U.S. Const., amend. VIII), and the proportionate penalties clause of the Illinois Constitution, which prohibits

sentences that are "grossly disproportionate" to the crimes for which they are imposed (Ill. Const. 1970, art. I, § 11). The latter provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (*id.*) and prohibits criminal punishments that are "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community" (*Sharpe*, 216 Ill. 2d at 493).

¶ 70    In *Avila-Briones*, this court noted that our supreme court has never decided whether the current version or any historical version of the SORA Statutory Scheme runs afoul of these constitutional limitations. *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 57. The *Avila-Briones* court found the recent decision of the Kansas Supreme Court in *State v. Mossman*, 281 P.3d 153 (Kan. 2012), to be persuasive. *Mossman*, like *Avila-Briones*, involved the statutory rape of a teenaged girl by a defendant in his twenties. *Mossman*, 281 P.3d at 156-57; *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 60. Although the encounters in those cases did not involve force, the youth of the victims made them legally incapable of exercising sexual consent. *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 60. Noting that the requirements and restrictions imposed on the offenders in those cases, if perhaps not precisely matched to the nature of their crime, were still legitimately related to the penological goal of preventing recidivism, the *Avila-Briones* court, like the *Mossman* court, concluded that a lifetime of post-release supervision was not disproportionate to the severity of the defendant's crime. *Id.* ¶¶ 59, 61-62, 67.

¶ 71    Here, although A.T. was 18 years old at the time of the offense, Mr. Parker's conviction for criminal sexual assault was based on the circuit court's finding that A.T. was compelled through physical force or threat of force to submit to sexual contact with Mr. Parker. We cannot

conclude that this offense is less severe than the one considered in *Avila-Briones*, which involved no physical force or threat of force. Like the court in that case, we find that the requirements and restrictions Mr. Parker faces are not disproportionate to the severity of his crimes.

¶ 72    In support of his eighth amendment and proportionate penalties argument, Mr. Parker cites *People v. Leon Miller*, 202 Ill. 2d 328, 340 (2002), in which the Illinois Supreme Court upheld an as-applied challenge to the imposition of a mandatory natural life sentence for a juvenile who was tried in adult court and convicted of multiple murders under a theory of accountability. Although Mr. Parker was not a juvenile at the time of his offenses, he claims that the distinction is an arbitrary one, where scientific research has concluded that "the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." Petition for Writ of Certiorari at 13, Patterson v. Texas, 536 U.S. ___ (2002) (No. 02-6010) (declaration of Dr. Ruben C. Gur, Ph.D.). Mr. Parker also notes that, if he had been only two years younger on the date of his offense, he would have been afforded an opportunity to eventually demonstrate that he was rehabilitated. See 730 ILCS 150/3-5(c)-(d) (West 2014).

¶ 73    Although the State does not address *Leon Miller*, we do not find it applicable. While we agree that the restrictions imposed by the SORA Statutory Scheme are serious, they cannot be compared to the sentence of life in prison that was imposed in *Leon Miller*. See *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 65 (finding *Leon Miller* distinguishable on this basis).

¶ 74    Accordingly, we hold that, even if the requirements and restrictions of the SORA Statutory Scheme are a form of punishment, they are not grossly disproportionate to Mr. Parker's

offense.

¶ 75                    III. Due Process Challenges

¶ 76    Mr. Parker also makes two facial challenges to the SORA Statutory Scheme. He argues both that the scheme violates the procedural due process rights of sex offenders because it provides those offenders with a low chance of recidivism no mechanism by which they can be removed or excluded from the scheme's requirements and restrictions. Mr. Parker also argues that the SORA Statutory Scheme violates the substantive due process rights of sex offenders because it infringes on fundamental rights or, in the alternative, fails a rational basis review. The State urges us to follow recent decisions of this court rejecting these same arguments.

¶ 77    Shortly after Mr. Parker filed his opening brief in this case, the *Avila-Briones* court examined and rejected the very constitutional arguments that Mr. Parker makes here. *Avila-Briones*, 2015 IL App (1st) 132221, ¶¶ 69-92. These arguments were likewise rejected by this court in *A.C.*, 2016 IL App (1st) 153047 (rejecting due process and eighth amendment challenges to the SORA Statutory Scheme as applied to a juvenile offender) and *Pollard*, 2016 IL App (5th) 130514, ¶ 23 (following the "persuasive reasoning" articulated in *Avila-Briones* and rejecting procedural and substantive due process claims and eighth amendment proportionate penalties challenges to the SORA Statutory Scheme). Having considered Mr. Parker's arguments, we agree with the conclusions reached in those decisions.

¶ 78    The *Avila-Briones* court addressed the argument that there is a fundamental right "to be free from a lifetime of burdensome, intrusive monitoring and restrictions," and that the SORA Statutory Scheme infringes on that right, or that in any event the provisions do not pass rational basis review. *Avila-Briones*, 2015 IL App (1st) 132221, ¶¶ 69-71. After analyzing the

prohibitions, obligations, and mandatory dissemination of information required by the SORA Statutory Scheme, the court determined that the provisions did not infringe on any fundamental right. *Id.* ¶¶ 72-76 (citing *Doe v. City of Lafayette*, 377 F.3d 757, 770-71 (7th Cir. 2004); *Cornelius*, 213 Ill. 2d at 203-04; *In re J.W.*, 204 Ill. 2d 50, 67 (2003); *Rodrigues v. Quinn*, 2013 IL App (1st) 121196, ¶¶ 1-2, 7; *In re Marriage of Charnogorsky*, 302 Ill. App. 3d 649, 660 (1998); and *Guerrero v. Ryan*, 272 Ill. App. 3d 945, 951 (1995)). The court then determined that the SORA Statutory Scheme passes rational basis review because it serves the legitimate state interest of protecting the public from sex offenders and is rationally related to that interest despite the possibility that it may be over-inclusive. *Id*. ¶¶ 82-84 (citing *Maddux v. Blagojevich*, 233 Ill. 2d 508, 547 (2009); *Cornelius*, 213 Ill. 2d at 205; *J.W.*, 204 Ill. 2d at 67-68; *Adams*, 144 Ill. 2d at 390; and *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 369 (1986)).

¶ 79 Mr. Parker respectfully urges this court to disagree with the *Avila-Briones* court's conclusion that none of the SORA monitoring requirements or restrictions infringe on a fundamental right. However, in reference to the registration requirement itself, the court in *Avila-Briones* relied on binding Illinois Supreme Court precedent. *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 74 (citing *J.W.*, 204 Ill. 2d at 66, which held that requiring juveniles to register as a sexual offender for the rest of their natural life does not implicate a fundamental right, and *Cornelius*, 213 Ill. 2d at 204, which held that dissemination of sex offenders' personal information does not impact fundamental rights). The *Avila-Briones* court then analyzed each of the additional restrictions on where a registered sex offender may work, live, or be present, the license renewal requirement, and the prohibition on a registered sex offender changing his or her name, and declined to recognize any of them as implicating what would clearly be a new

fundamental right. *Id.* ¶¶ 75-76. We agree that these burdens and restrictions, while not insignificant, simply do not rise to the level of infringement on a fundamental right.

¶ 80    Mr. Parker also cites studies showing that most sex offenders do not recidivate. However, the rational basis test requires only that the challenged statute "bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor unreasonable." *People v. Hollins*, 2012 IL 112754, ¶ 15. "As long as there is a conceivable basis for finding a rational relationship, the law will be upheld." *Harris*, 111 Ill. 2d at 368. While not every offender is necessarily inclined to commit another sex offense, subjecting that group as a whole to certain restrictions does serve a legitimate state purpose which the SORA Statutory Scheme is rationally related to achieving, even though it may not be "finely-tuned" to do so. *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 84.

¶ 81    The *Avila-Briones* court also rejected the argument that the SORA Statutory Scheme violates procedural due process by failing to include a mechanism by which the state would ensure that only "those who actually pose a risk of committing additional sex crimes" would be subject to the burdensome restrictions of those laws. *Id.* ¶ 90. The court held, relying on *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 4, 7-8 (2003), that no such additional procedures would be necessary to satisfy due process because the SORA Statutory Scheme is based entirely upon the convicted offense, which the offender received "a procedurally safeguarded opportunity to contest," and the offender's likelihood to reoffend is not relevant to determining whether he committed the charged crime. (Internal quotation marks omitted.) *Avila-Briones*, 2015 IL App (1st) 132221,. ¶¶ 88-92.

¶ 82    Mr. Parker argues that defending himself against the charged criminal offenses is quite

different from the case he would make in an attempt to disprove the likelihood that he would reoffend. This may well be true. However, as the court recognized in *Avila-Briones*, once it has been determined that the SORA Statutory Scheme is not unconstitutional, there is no constitutional mandate for procedures that would allow a convicted defendant to demonstrate that he or she is not likely to reoffend. *Id.* Thus, there is no basis for finding that the SORA Statutory Scheme violates procedural due process requirements.

¶ 83                                    CONCLUSION

¶ 84    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 85    Affirmed.