# Illinois Official Reports

## Appellate Court

*People v. Harper*, 2017 IL App (4th) 150045

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAFAYETTE HARPER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0045 |
| Filed | July 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 10-CF-647; the Hon. Nancy S. Fahey, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael Gentithes, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jacqueline M. Lacy, State's Attorney, of Danville (Patrick Delfino, David J. Robinson, and Linda S. McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE POPE delivered the judgment of the court, with opinion.<br>Justices Holder White and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1        In October 2014, defendant, Lafayette Harper, was convicted of first degree murder. In December 2014, the trial court sentenced him to 65 years in prison. Defendant appeals, raising the following arguments: (1) the State failed to prove his guilt beyond a reasonable doubt; (2) defendant's waiver of a 12-person jury was not knowing and intelligent; (3) the court erred in admitting the content of text messages from a cell phone registered to defendant because the messages lacked authentication and contained multiple layers of hearsay; (4) the court erred in admitting statements made by Davieon Harper under the coconspirator exception to the hearsay rule; (5) the State violated defendant's due process rights when it disposed of the vehicle where the shooting occurred before defendant could collect potentially exculpatory evidence from it; (6) the State erred in shifting the burden of proof to defendant during the State's rebuttal closing argument; and (7) defendant's 65-year prison sentence was excessive. We reverse defendant's conviction and remand for a new trial because the court erred in allowing the jury to see the inadmissible content of text messages stating unsubstantiated street rumors that defendant had killed a "white boy" after repeatedly telling defendant the jury would not see the content of those text messages.

¶ 2                                              I. BACKGROUND

¶ 3        In November 2010, the State charged defendant by information with four counts of first degree murder for the death of Timothy A. Shutes, Jr. Shutes was killed on October 24, 2009. This court has decided two interlocutory appeals in the case related to motions to suppress statements made by defendant to police during an interrogation. *People v. Harper*, 2012 IL App (4th) 110880, 969 N.E.2d 573; *People v. Harper*, 2013 IL App (4th) 130146, 1 N.E.3d 654. The interlocutory appeals are not relevant to our disposition here.

¶ 4        On January 8, 2013, defendant filed a motion to bar the prosecution from using fingerprint evidence it obtained from the vehicle where the shooting occurred because the State had not preserved the vehicle. The Illinois State Police crime lab identified some of the fingerprints lifted from the back passenger door of the vehicle as belonging to defendant. After the police processed the vehicle as part of their investigation, the car was towed to Coultas Recycling. The car was crushed for scrap in October 2011, about two years after the murder and almost one year following the filing of the charges herein. On March 24, 2014, defendant filed an amended motion to bar the evidence for failure to comply with section 116-4 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/116-4 (West 2012)).

¶ 5        On June 30, 2014, the trial court denied defendant's motion to bar the State from using the fingerprint evidence. The court ruled the vehicle was not forensic evidence. Instead, the fingerprints taken from the vehicle were the forensic evidence. This evidence had been preserved and was available to defendant. The court noted, "the Defendant has not alleged that the vehicle in question contained any other specific evidence in or on the vehicle that was not already obtained that would exonerate the defendant." Further, the court found the fingerprints were not determinative to the outcome of the case. The order states, "The Defendant makes the argument that they are pivotal in this specific case, however, a First Degree Murder charge can be proven without fingerprint evidence unlike the situation in *Newberry* where the charge was possession of a Controlled Substance and the controlled substance was destroyed." The court also noted defendant did not allege the State or police did anything in bad faith.

¶ 6	At defendant's trial, before a six-person jury, Randall Smalley testified he arranged for Shutes to buy marijuana through Davieon Harper. The parties agreed to a purchase price of $3500 for five pounds of marijuana. Shutes and his girlfriend, Ieca Smalley, who was Randall's sister, picked up Randall so they could meet Davieon on the east side of Danville. Davieon told Randall and Shutes they would have to ride with him because the seller did not want additional vehicle traffic. Randall got in the front passenger seat and Shutes got in the back seat on the passenger side. Ieca Smalley did not go with the men.

¶ 7	Davieon told Randall they were going to make the exchange at a park. Randall testified Davieon was on his cell phone on the way to the park. Randall could hear text messages being sent to and from Davieon's phone. Davieon called someone while they were driving and told the person on the other end of the call Randall and Shutes had the money for the drugs. When the person on the other end of the call asked if the buyers had $3500, Davieon took the call off speakerphone.

¶ 8	After arriving at the park, Davieon received a text message and then, about two minutes later, he got another text message. Almost immediately after the second message, someone opened the back door of the vehicle and reached for Shutes's backpack. Shutes and the man started fighting for the backpack. Randall looked down and saw Davieon had a gun. Davieon told Randall, "If you move, you're dead." Davieon, who weighed between 300 and 400 pounds, grabbed Randall around the neck and restrained him. Randall was "sitting sideways in the seat" and could see the struggle between the shooter and Shutes. Randall saw the other man hit Shutes in the head with the end of the shotgun and then he shot Shutes.

¶ 9	After the shooting, both Davieon and the shooter left the vehicle. The shooter ran around the car and the two said something to one another. The shooter ran off, and Davieon then tossed his gun onto the roof of a building. Randall got out of the car and ran to the closest person he saw outside, so he could use the person's phone.

¶ 10	Randall called the police and then ran back toward the car. Davieon was back in the car and drove off with Shutes. Randall got a ride to where his sister was waiting. The two then drove to the hospital. When they got to the hospital, his sister hopped out of the car, but Randall left because he saw the police approaching his sister. Instead, he drove to his parents' house and called the police.

¶ 11	Randall talked to the police that night. At that time, he did not know who the shooter was. He only saw the bottom half of the shooter's face, from the nose down, because the shooter had on a hooded sweatshirt, the hood was up, and the strings were pulled, making the opening for the shooter's face smaller. He did not tell the police during the initial questioning about the hooded sweatshirt. His first testimony regarding the shooter wearing a "hoodie" was in September 2010, presumably at Davieon's trial. Randall could see the shooter had sideburns and some facial hair.

¶ 12	On cross-examination, Randall testified he met with Detective Stark and Officer Pat Alblinger around 9:15 p.m. on the night of the shooting. He described the shooter as a black man in his late twenties to thirties, 6 feet 4 inches to 6 feet 5 inches tall, with a skinny build, wearing a tan jacket, dark shirt, and blue jeans. Two days later, on October 26, 2009, Randall was shown a photo lineup that included defendant. He did not identify defendant in the lineup.

¶ 13	Randall testified he had been given the names of three or four other possible suspects prior to May 2010. He looked these people up on the Internet. He did not identify any of those individuals as the shooter. Randall admitted he previously testified at a hearing in September

2010 (again presumably at Davieon's trial) that he did not see the shooter's face. It was during this testimony that Randall first mentioned the shooter was wearing a dark "hoodie." On redirect examination at defendant's trial, Randall clarified his earlier testimony regarding what he saw, stating he meant he did not see the shooter's entire face.

¶ 14 On May 24, 2010, Randall told Detective Bransford he knew defendant was the shooter after seeing defendant's picture online. The record is unclear how Randall came across defendant's picture online. The record reflects Randall had been given the names of other potential suspects in the murder. However, the record is not clear whether anyone provided defendant's name to Randall. The photograph he saw online, which the State introduced as People's exhibit No. 51-1, was a mug shot of defendant. He also saw People's exhibit No. 51-2 online, a side-profile mug shot of defendant, whom he identified as the shooter. Randall admitted it was dark when the shooting occurred, and the park was not well lit.

¶ 15 Logan Vance testified he was in cosmetology school with defendant in 2009. He obtained shotgun shells for defendant in September or October 2009.

¶ 16 John Scott Denton, a forensic pathologist, testified he performed an autopsy on Shutes and determined the cause of death was a shotgun wound to the head.

¶ 17 Brian Long, a forensic scientist specializing in the examination of latent prints, testified he examined fingerprint evidence collected from the vehicle. He matched three prints from the rear passenger door of the vehicle to defendant's right thumb and middle and ring fingers. Long stated he did not know when those prints were left on the vehicle.

¶ 18 Jennifer Aper, a forensic scientist at the Illinois State Police forensic science laboratory, testified she tested deoxyribonucleic acid (DNA) found on a backpack. Defendant could not be excluded as the contributor of the DNA on the backpack. When asked about the statistics assigned to that evidence, she stated that approximately 25% of unrelated African-Americans, Caucasians, and Hispanics could not be excluded as being contributors to the mixture of DNA profiles found on the backpack. On cross-examination, Aper testified she excluded defendant as the source of DNA found on the recovered shotgun.

¶ 19 Detective Josh Campbell of the Danville police department testified he was involved in the murder investigation. He met with Davieon Harper on the night of the shooting. Davieon provided Campbell with his cellular phone. The number for the phone was 217-712-0758.

¶ 20 Dan Markus, a customer service analyst and legal liaison at Verizon, testified the phone number 217-474-3731 was registered to defendant. Through Markus, the State introduced a call log showing calls to and from this number. Around the time of the shooting, the phone records showed numerous calls between the phone Davieon provided to the police and the phone registered to defendant.

¶ 21 Near the end of the second day of trial, when the parties and the trial court were discussing the State's exhibits, defense counsel made an objection with regard to the Verizon phone records for a cellular phone registered to defendant. In part, defendant argued the records included text messages that contained inadmissible hearsay. The court admitted the records over defendant's objection. Shortly after the court agreed with the State that the phone records were admissible, defense counsel asked the court to revisit the issue. Defense counsel noted:

> "With regard specifically to the text messages, I believe when we were discussing objections [prior to the trial], Your Honor, [the State] indicated to the Court specifically that there was not going to be any text messages that were going to be introduced

through the witnesses which she called in her case in chief. I would like to add that as an addition to my objection to the fact that the records themselves are hearsay. I understand she—it's her position that they are kept in the ordinary course of business, but they are not just the records of the phone contacts themselves. There's actual information in that, and it's not relevant—those messages are not relevant to this case at hand, Your Honor, and no one has testified about those, the contents of those. All this being said, Judge, I don't think the text messages should be admitted. If they want to parse out and introduce the phone records, the actual call log that was talked about, I don't have an objection to that being admitted into evidence."

The court noted it would stand on its previous ruling to admit the phone records.

¶ 22    Later that day, the issue of whether the State had agreed not to introduce the text messages came up again. The State argued defense counsel was taking its earlier statement out of context. The court and counsel then had the following exchange:

"THE COURT: "There's no way I am going to allow those business records with the attached text messages to go back to the jury. The text messages are not going to be included when that goes back to the jury.

[THE STATE]: Well, she's talking about admission, at this point.

THE COURT: I know she's talking about admission, but I'm just telling you, the jury is never going to see that, those text messages.

[DEFENSE COUNSEL]: I understand what the Court is saying, and I mean obviously, I'm objecting to their admission, but I'm also, obviously, I would object to them going back as well, Your Honor.

THE COURT: Well, they are not going back. I'm not going to change my ruling on the admission until I see a complete transcript. Are we ready to go on the jury instructions?"

However, the next day, just before defense counsel was ready to call its only witness, the court changed its ruling, stating:

"The transcript that I was provided on this issue was just a very, very partial transcript of the issue in question. The line that the Defendants were relying on in saying that there was an agreement between the parties as to the text messages, in the Court's opinion, was an off-hand statement by Ms. Lacy—Ms. Lawlyes, excuse me. There was no follow-up to that statement. There was no indication, as is usually done in this courtroom, when the parties reach an agreement. One or the other of the attorneys will recite what the agreement is, then I will ask the other attorney, 'Is that your understanding of the agreement?' And then in my mind, we then have an agreement. This off-handed statement by Ms. Lawlyes, that says, 'In this case, we plan on presenting—and I know the text messages are not going to come in.' It is in no way, shape or form an agreement between the parties in this Court's opinion, and in this Court's opinion, in addition, what Ms. Lawlyes is stating is not Ms. Lawlyes' decision. It's the Court's decision whether or not the text messages would come in. So, I find, based on what I have been presented, that there was no agreement between the parties as to the text messages, and thankfully, that will explain why when we had the side-bar and Ms. Morris said we had an agreement on text messages, I was completely drawing a blank, thinking, 'I don't remember any agreement on text messages,' and concerned

that I was losing my mind or something. But I do not feel like there was any agreement at all on text messages. From what I understand about agreement, contract law, this does not represent an agreement on text messages, and so I'm going to go back on what I said yesterday, and if in fact People's Exhibit 50 does go to the jury, it will go to the jury in its entirety. Okay. Are we ready to have the jurors brought in?"

The court allowed People's exhibit No. 50 to go to the jury over defendant's objection.

¶ 23 One series of text messages, which began approximately three hours after the murder, was sent back to the jury. A message was sent to defendant's phone, stating: "I heard you had something to do with a white boy getting killed today." Approximately one minute later, a response was sent from defendant's phone, stating: "What white boy[?]" After between three and four minutes, another message was sent from defendant's phone, stating "Hello." Another message was then sent to defendant's phone, "Out in the hood." A message was then sent from defendant's phone, stating: "What are [you] talking about[?]" The person on the other phone then responded, "I heard a white boy got killed in the hood and you and some of your guys did it[.] [T]hat's the word on the streets."

¶ 24 The jury found defendant guilty of first degree murder. In December 2014, the trial court sentenced defendant to 65 years in prison.

¶ 25 This appeal followed.

¶ 26 II. ANALYSIS

¶ 27 Because we are reversing defendant's conviction and remanding for a new trial, we do not need to address several of the issues defendant raised on appeal. The issues we do address are not necessarily in the order defendant raised them.

¶ 28 A. Jury Waiver

¶ 29 We first address defendant's argument he did not make a knowing and intelligent waiver of his right to a 12-person jury. Defendant argues "[t]he circuit court violated [his] constitutional jury trial right when it accepted his unwritten waiver of a 12-person jury and only admonished [defendant] that he was foregoing a 'customary twelve-panel jury.' " According to defendant, his waiver of a 12-person jury was not knowing and intelligent because he did not sign a written waiver. Defendant was tried by a jury comprised of six people.

¶ 30 Illinois courts have held a defendant "may waive participation of the full number of jurors and proceed with fewer than 12." *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 78, 919 N.E.2d 311, 315 (2009). However, at least one Illinois court has presumed prejudice when the record is silent on whether the defendant was aware of his right to a 12-person jury. *People v. Matthews*, 304 Ill. App. 3d 415, 419-20, 710 N.E.2d 524, 527 (1999). According to defendant, "*Matthews* illustrates the necessity for clear proof on the record that the defendant knowingly and intelligently waived a 12-person jury" for a 6-person jury. Defendant also points to section 115-1 of the Procedure Code (725 ILCS 5/115-1 (West 2012)), which states "[a]ll prosecutions *** shall be tried by the court and a jury unless the defendant waives a jury trial in writing."

¶ 31 The State points out a trial court does not need to give any specific admonition or advice for a jury waiver to be valid. *People v. Bannister*, 232 Ill. 2d 52, 66, 902 N.E.2d 571, 581 (2008). "The determination of whether a jury waiver is valid cannot rest on any precise formula, but rather depends on the facts and circumstances of each particular case." *Id.* The

State distinguishes the situation in *Matthews* from the situation here because nothing in the record in *Matthews* indicated the defendant in that case was aware of his right to a 12-person jury.

¶ 32    Based on the record here, defendant in this case clearly knew of his right to a 12-person jury. As a result, this case is distinguishable from *Matthews* and in line with the Second District's decision in *People v. Dereadt*, 2013 IL App (2d) 120323, ¶ 17, 997 N.E.2d 802. Defendant has not established that his decision to choose a 6-person jury was not a valid waiver of his right to a 12-person jury. Defense counsel requested a six-person jury in this case, stating in open court in defendant's presence that she had spoken to defendant about this issue and defendant had decided to proceed with a six-person jury.

¶ 33    The trial court then questioned defendant about his choice to proceed with a six-person jury. Defendant stated he discussed this issue with his trial counsel, and defense counsel answered all of his questions. In response to the court's inquiry, defendant stated he had no questions for the court with regard to having a 6-person jury instead of a 12-person jury. Only then did the trial court accept defendant's waiver. We find no error with regard to the acceptance of defendant's waiver of a 12-person jury in favor of a 6-person jury.

¶ 34                                B. Disposal of Vehicle

¶ 35    We next address defendant's argument that the State violated his due process rights by disposing of the car in which the shooting occurred before defendant could collect potentially exculpatory evidence from the vehicle. Defendant points to a discovery motion he filed on December 2, 2010. The motion asked for the State to disclose and produce:

> "7. All books, papers, documents, photographs or tangible objects, including but not limited to any audio, video, digital or electronic recordings, which the prosecuting attorney intends to use in the hearing or trial."

We first note this discovery motion did not specifically mention the vehicle. Further, the State did not use the vehicle at trial, and the record contains nothing to indicate the State intended to use the vehicle at trial. The fingerprints found on the vehicle's door, which the State used at trial, had been preserved and were available for further testing by defendant. We also note defendant has not alleged the vehicle contained any specific evidence, not already obtained, that would exonerate him. Finally, we recognize 10 months passed between defendant's discovery request and the scrapping of the vehicle. It does not appear defendant made any effort to examine the vehicle during that period of time.

¶ 36    The destruction or disposal of potentially exculpatory evidence violates a defendant's federal due process rights if the State acted in bad faith and the evidence was important, relative to the evidence presented against the defendant at trial. See U.S. Const., amend. XIV; *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *People v. Hobley*, 159 Ill. 2d 272, 307-08, 637 N.E.2d 992, 1007-08 (1994). Defendant argues the State acted in bad faith by rapidly disposing of evidence it knew would be used at defendant's murder trial. In the trial court, defendant's attorney stated she did not think the police department acted in bad faith. As a result, we find defendant forfeited any argument the State acted in bad faith.

¶ 37    Regardless, defendant fails to persuade us the State acted in bad faith with regard to the destruction of the vehicle. Defendant's reliance on *People v. Walker*, 257 Ill. App. 3d 332, 628 N.E.2d 971 (1993), is misplaced. The court in *Walker* found the police acted in bad faith based

on the quick destruction of material evidence. The evidence was central to the defendant's misidentification defense, and the government used the testimony regarding the lost evidence in order to convict defendant. *Id.* at 335-36, 628 N.E.2d at 973-74. In this case, the State did not rapidly dispose of the vehicle. Moreover, the State did not try to use any evidence from the vehicle that had not been preserved. This is a far cry from the situation in *Walker*, where the State had destroyed evidence six weeks after the defendant's arrest and more than eight months before trial. *Id.* at 333-34, 628 N.E.2d at 972.

¶ 38     We next turn to the argument defendant made in the trial court, *i.e.*, the State violated his right to due process under article I, section 2,of the Illinois Constitution (Ill. Const. 1970, art. I, § 2) by allowing the vehicle to be destroyed, irrespective of whether the State acted in bad faith. Defendant relies on our supreme court's decision in *People v. Newberry*, 166 Ill. 2d 310, 652 N.E.2d 288 (1995). Defendant notes many other states have rejected the bad-faith requirement found in *Youngblood*. According to defendant:

> "In *People v. Newberry*, the Illinois Supreme Court found that the State violates a defendant's due process rights where it disposes of evidence that is 'essential to and determinative of the outcome of the case' after being put on notice that the defendant wants the evidence preserved. 166 Ill. 2d 310, 315, 317 (1995). The State is on notice '[w]here evidence is requested by the defense in a discovery motion.' *Id.* at 317. In such cases, '[n]o showing of bad faith is necessary' to establish a due process violation. *Id.*"

According to defendant, this case meets the criteria laid out in *Newberry*.

¶ 39     It is not clear whether the outcome-determinative analysis adopted in *Newberry* is still valid after the United States Supreme Court's decision in *Illinois v. Fisher*, 540 U.S. 544 (2004). In *Fisher*, the Supreme Court held the destruction of " 'potentially useful' " evidence (as opposed to " 'material exculpatory' evidence") constitutes a denial of a defendant's *federal* due process rights only if the State acted in bad faith. *Id.* at 548-49. In *People v. Sutherland*, 223 Ill. 2d 187, 240, 860 N.E.2d 178, 215 (2006), our supreme court avoided the question whether *Newberry*'s outcome-determinative test was still valid in light of *Fisher* because *Newberry* was inapplicable under the facts in *Sutherland*. Our supreme court stated:

> "In *Newberry*, the evidence destroyed by the State—the suspected cocaine—formed the very basis of the drug-possession charge against the defendant. Here, the evidence lost or destroyed by the State—the vehicle—did not form the basis of the kidnapping, sexual assault and murder charges against defendant. Nor was the vehicle, itself, central or critical to the State's case. The critical evidence was the hair, fibers, carpet standards, and fabric standards removed from the vehicle. This evidence *** [was] available to defendant for examination by his own experts. In addition, unlike the defendant in *Newberry*, who was deprived of any opportunity to examine the destroyed evidence, defendant had access to the vehicle during his first trial and for a time thereafter. Finally, unlike the *Newberry* case, where the disputed substance was destroyed following a specific discovery request, here the trial court found that the vehicle was lost or destroyed prior to defendant's discovery request. *** Under *Newberry* or *Youngblood*, defendant's due process claim fails." *Id.*, 860 N.E.2d at 215-16.

¶ 40     We also do not need to consider whether *Newberry*'s outcome-determinative analysis is still valid because *Newberry* is not applicable here. Like in *Sutherland*, the vehicle here did not

form the basis of any charge against defendant. The car itself was not central or critical to the State's case. The fingerprints which were found on the vehicle were preserved and available to defendant. Further, defendant had time to access the vehicle before it was destroyed. Finally, while defendant filed a discovery motion before trial, he did not specifically ask the State to preserve the vehicle. Defendant's reliance on paragraph 7 of his discovery motion is misplaced because no evidence exists the State ever planned to use the car itself at defendant's trial.

¶ 41 According to defendant's brief, had he "inspected the car and collected physical and biological evidence, he could have wholly discredited the State's case and bolstered his own." Defendant fails to explain how he would have done this. We note the State did not find any evidence other than the fingerprints tying defendant to the vehicle. Further, other than the victim's DNA, no DNA was found in the vehicle.

¶ 42                    C. Coconspirator Hearsay Exception

¶ 43 We next address defendant's argument that the trial court erred in ruling the State made a *prima facie* showing of a conspiracy between Davieon Harper and defendant and allowing Davieon's hearsay statements to be admitted at defendant's trial. According to defendant, the court erred because of a lack of proof Davieon and defendant agreed to any criminal enterprise and the evidence of defendant's involvement in the crime was "deeply flawed." Defendant says he was extremely prejudiced by two of Davieon's hearsay statements admitted at trial. First, Randall Smalley was allowed to testify that Davieon "called somebody and told them, you know, that we had the money, and how much we wanted, and as soon as the guy asked, whoever was on the other phone asked if we had $3,500, he took it off speakerphone." Randall was also allowed to testify that Davieon told him, "If you move, you're dead." This was said while Davieon was armed with a pistol and had Randall around the neck in a choke hold during the robbery and murder. Defendant argues the error was compounded because the State discussed these statements during its closing arguments.

¶ 44 "The coconspirator exception to the hearsay rule provides that any declaration by one coconspirator is admissible against all coconspirators where the declaration was made during the pendency of and in furtherance of the conspiracy." *People v. Denson*, 2013 IL App (2d) 110652, ¶ 11, 1 N.E.3d 27. A coconspirator's statements must be made "with the purpose to advance the objective of the conspiracy" to fall under the exception to the hearsay rule. *People v. Eddington*, 129 Ill. App. 3d 745, 773, 473 N.E.2d 103, 122 (1984). The statements complained of by defendant show Davieon was likely conspiring with someone to rob Smalley and Shutes and the statements were made by Davieon during the pendency and in furtherance of the conspiracy. However, the question here is whether the State established a *prima facie* case of a conspiracy between Davieon and defendant to commit the robbery, which resulted in Shutes's murder.

¶ 45 To take advantage of this exception to the hearsay rule, the State must provide evidence establishing a *prima facie* showing of a conspiracy in which the defendant was involved. *People v. Roppo*, 234 Ill. App. 3d 116, 123, 599 N.E.2d 974, 979 (1992). The evidence establishing the *prima facie* showing must be "sufficient, substantial, and independent of the declarations made." *People v. Duckworth*, 180 Ill. App. 3d 792, 795, 536 N.E.2d 469, 471 (1989).

¶ 46 At the hearing on the State's motion *in limine* to admit Davieon's statements pursuant to the coconspirator exception to the hearsay rule, the State noted it intended to offer the

following independent facts at defendant's trial to show evidence of a conspiracy between Davieon and defendant. Defendant's fingerprint was on the passenger door of the vehicle, and repeated telephone contact occurred between Davieon and defendant prior to and near the time of the murder. However, the State noted defendant's name was never mentioned in these telephone calls and Randall Smalley would not be able to identify defendant's voice on the calls. The State told the trial court that none of Davieon's statements it wanted to introduce were particularly damning. The court allowed the State's motion *in limine* on this issue, stating:

> "The State has presented facts independent of the statement that would support introduction of the statements through the co-conspirator exception. Latent fingerprints regarding the defendant's identification by Randy Smalley and testimony of Randy Smalley from the Davion [*sic*] Harper trial are sufficient to meet the independent requirement."

¶ 47    The State argues defendant forfeited this issue because he did not raise it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 185-86, 522 N.E.2d 1124, 1129-30 (1988). However, defendant argues we should consider this issue under the plain-error rule. Before we determine whether the plain-error rule applies, we first determine whether an error actually occurred.

¶ 48    We note the trial court's reasoning for its decision was incorrect. The court based its decision simply on the fact that the State had evidence defendant was present at the scene of the crime. Defendant's presence alone is not sufficient proof of a conspiracy. See *Duckworth*, 180 Ill. App. 3d at 795, 536 N.E.2d at 472 ("the mere appearance of defendant at the scene *** does not establish any illicit association"). However, we are reviewing the trial court's decision, not its reasoning. *People v. Stoudt*, 198 Ill. App. 3d 124, 125, 555 N.E.2d 825, 826 (1990).

¶ 49    Defendant argues the State "simply had no evidence of contact between Davieon and [defendant], let alone a meeting of the minds sufficient to establish a *prima facie* conspiracy." However, evidence of a conspiracy can be totally circumstantial, as long as the evidence is sufficient, substantial, and independent of the hearsay statements sought to be introduced. *Duckworth*, 180 Ill. App. 3d at 795, 536 N.E.2d at 471. The State presented additional evidence independent of Davieon's hearsay statements.

¶ 50    The State presented evidence defendant's fingerprints were on the rear passenger door of the vehicle and Randall Smalley identified defendant as the shooter. As stated earlier, this evidence does not establish a conspiracy. However, Randall Smalley also testified Davieon Harper restrained him around the neck and displayed a handgun to Smalley while defendant was robbing and murdering Shutes. After defendant shot Shutes, Davieon and defendant quickly exchanged words outside the vehicle. Davieon's reaction to someone with a gun suddenly opening the backdoor of his car and robbing and shooting Shutes is strong circumstantial evidence Davieon and the shooter had conspired to at least rob Shutes and Smalley. In addition, the State introduced evidence showing multiple phone calls between phones belonging to Davieon and defendant around the time of the murder. When this evidence is combined with Smalley's identification of defendant as the shooter, a strong circumstantial case exists Davieon and defendant conspired to rob Smalley and Shutes. As a result, we do not find the trial court erred in finding a conspiracy existed between defendant and Davieon Harper.

¶ 51    Defendant only makes a broad argument regarding whether Davieon's hearsay statements should have been admitted under the coconspirator exception to the hearsay rule. He did not make an alternative argument regarding the admissibility of certain statements made by Davieon if we determined a conspiracy was established. As a result, we will not examine the individual statements.

¶ 52                                    D. Text Messages

¶ 53    We next address defendant's argument that the trial court erred in admitting text messages from a cell phone registered to defendant. According to defendant, the court not only ignored the rules of evidence but also the State's promise not to introduce the text messages found in Verizon's records for the phone registered to defendant.

¶ 54    Most of the content of the text messages was fairly innocuous, and most of the messages appear to be unrelated to this case. However, one series of messages was extremely prejudicial to defendant, considering Randall Smalley failed to identify defendant as the shooter until months after the shooting.

¶ 55    The trial court allowed the jury to see the following text message exchange, which took place approximately three hours after the murder between a cellular phone belonging to defendant and another unidentified person. At 11:06 p.m., a message was sent to defendant's phone, stating: "I heard you had something to do with a white boy getting killed today." Approximately one minute later, a response was sent from defendant's phone, stating: "What white boy[?]" After between three and four minutes, another message was sent from defendant's phone, stating "Hello." Another message was then sent to defendant's phone, "Out in the hood." A message was then sent from defendant's phone, stating: "What are [you] talking about[?]" The person on the other phone then responded, "I heard a white boy got killed in the hood and you and some of your guys did it[.] [T]hat's the word on the streets."

¶ 56    We fail to see how these damaging incoming messages could possibly be admissible based on the record in this case. Defendant goes even further, arguing that none of the texts were admissible pursuant to the business records exception. According to defendant:

> "The hearsay exception in Rule 803(6) permits the admission of business records that were made at the time the information contained therein was transmitted, if kept in the regular course of business as a regular practice of that business. Ill. R. Evid. 803(6). The exception recognizes businesses' motivation to keep accurate records, which they are unlikely to routinely falsify. *People v. Virgin*, 302 Ill. App. 3d 438, 450 (1st Dist. 1998).
>
> Business records contain multiple layers of hearsay where they include information supplied by a declarant 'not himself under a duty to provide such information' for the business. Michael H. Graham, *Graham's Handbook of Illinois Evidence* § 805, 1000 (10th ed. 2010). Multiple hearsay in a business record 'is excused by Rule 803(6) only where both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business.' *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 121."

The text messages provided to the jury do not meet this standard. Neither defendant nor the individuals sending text messages to defendant's phone were acting in the regular course of

business. As a result, the content of these incoming text messages was not admissible pursuant to the business records exception to the hearsay rule.

¶ 57    In addition, we do not know who was texting defendant's phone or who he was texting. A record from the phone company, showing the time and recipient or maker of calls to or from a number registered to defendant, is admissible as a business record. The same is true with regard to text messages. The fact calls and texts were made and received by defendant was properly authenticated. Evidence can be authenticated by direct or circumstantial evidence. *People v. Chromik*, 408 Ill. App. 3d 1028, 1046, 946 N.E.2d 1039, 1055 (2011). Text messages are subject to the same authentication requirements as traditional documents. *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 36, 25 N.E.3d 1189.

¶ 58    The State established a proper foundation to introduce evidence that calls and texts were made and received by defendant. As the State points out in its brief, a Verizon employee testified the number 217-474-3731 was assigned to an account under defendant's name. Detective Bransford also testified defendant provided that phone number as his own. As a result, this phone number was tied to defendant and provided a rational basis for the trier of fact to conclude text messages and phone calls to and from this number were made by or to defendant. See *People v. Walker*, 2016 IL App (2d) 140566, ¶ 13, 60 N.E.3d 101.

¶ 59    Defendant's reliance on *Watkins* is misplaced. In *Watkins*, the court allowed the State to introduce "photographs of two sets of drug-related text-message conversations containing the name 'Charles' that were found on a cell phone in close proximity to the drugs in the present case as evidence that defendant had a connection to the cell phone and, circumstantially, to the drugs." *Watkins*, 2015 IL App (3d) 120882, ¶ 1, 25 N.E.3d 1189. Three phones were recovered in the same kitchen drawer with the cocaine that was recovered. *Id.* ¶ 16. No information could be extracted from the phones during a forensic analysis. *Id.*

¶ 60    An officer was later able to turn on the cell phones and retrieved hundreds of text messages, mostly drug related, from one of the phones. The officer photographed the text messages that were on the phone. Over the defendant's relevancy, foundation, and hearsay objections to the introduction of the pictures, the trial court allowed the State to admit the photographed messages that "contained the name 'Charles' and that were related to tying the cell phone to defendant and drug dealing." *Id.* ¶ 17. Eventually, the court allowed the State to admit two text message conversations where the name "Charles" was mentioned. *Id.* ¶ 19. The police officer who testified about these text messages stated he did not know the number of the cell phone or to whom the cell phone belonged. *Id.* ¶ 24.

¶ 61    The Third District found the trial court erred in admitting these text messages because "[t]he only evidence presented by the State to authenticate the text messages was the fact that the cell phone was found in the same house as defendant, albeit in a drawer in a common area, and the fact that some of the messages referred to, or were directed at, a person named 'Charles.' " *Id.* ¶ 38. The appellate court found this information was not sufficient to authenticate the text messages as being sent to defendant. *Id.* The present case is distinguishable from *Watkins* because the State here had evidence the cell phone in question belonged to defendant.

¶ 62    Returning to the content of these text messages, we fail to see how the content of these messages was admissible based on the record in this case, considering the State did not identify who sent the messages. Putting aside the fact the State did not identify who sent these text messages to defendant or where any information regarding defendant's involvement in

Shutes's murder came from, most of these texts were irrelevant to this case. Further, while the messages questioning defendant's involvement in the murder were relevant, these messages to defendant were blatant hearsay. Even if the State identified the individual who sent these messages to defendant and called him as a witness at trial, the witness could not testify he "heard on the street" defendant was involved in Shutes's murder.

¶ 63     In addition to the fact the trial court allowed the jury to see extremely prejudicial, inadmissible evidence, we are also troubled by the manner in which the trial court decided to allow the jury to see this evidence. Shortly after the court agreed with the State that the phone records were admissible, defense counsel asked the court to revisit the issue. Defense counsel noted the State had indicated prior to trial it was not going to introduce any text messages during its case in chief. Defense counsel also indicated the messages were hearsay and not relevant to the case. Further, no one had testified about the content of those messages. According to defense counsel, she did not object to the call log being admitted if the text messages were not included. The court noted it would stand on its previous ruling to admit the phone records, including the actual text messages.

¶ 64     Later that day, the issue of whether the State had agreed not to introduce the text messages came up again. The State argued defense counsel was taking her statement out of context. The trial court made clear the text messages would not be going to the jury. However, the next day, just before defense counsel was ready to call her only witness, the court changed its ruling, stating the phone records would go to the jury in their entirety, including the content of the text messages. Regardless of the inadmissibility of the content of the text messages, the last-minute ruling put defendant at a disadvantage in defending himself in this case.

¶ 65     The trial court's decision to allow the jury to see the content of these inadmissible text messages sent to defendant was extremely prejudicial to defendant. One of the main points of defendant's case was the weakness of Smalley's identification of defendant as the shooter. The hearsay text messages to defendant regarding his involvement in the murder strengthened Randall Smalley's identification. Unlike Smalley's identification, which came months after the murder, the inadmissible text messages showed unknown people in the community were identifying defendant as the killer within hours of the murder. Further, the State did not identify who sent defendant these messages or where the sender of the message received the information regarding defendant's involvement in the murder. As a result, defendant was not able to challenge the reliability of the person sending the message or the individuals spreading this "word on the street." This error was so serious it requires reversing defendant's conviction and remanding for a new trial.

¶ 66                                          E. Other Issues
¶ 67     Because we are remanding this case for a new trial, we need not address defendant's claims that the State improperly shifted the burden of proof during its rebuttal closing argument or whether defendant's sentence was excessive. Further, double jeopardy does not foreclose another trial because the evidence presented at trial was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt. *People v. Lopez*, 229 Ill. 2d 322, 367, 892 N.E.2d 1047, 1073 (2008).

¶ 68                                    III. CONCLUSION

¶ 69          We reverse defendant's conviction because the trial court erred by allowing the jury to see the content of text messages sent the night of the murder, which contained inadmissible hearsay regarding defendant's rumored involvement in Shutes's murder.

¶ 70          Reversed and remanded.