2021 IL App (1st) 181585-U

No. 1-18-1585

Order filed June 8, 2021

Modified upon denial of rehearing August 31, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17 CR 08854 |
| | ) | |
| DOUGLAS JOHNSON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Michael J. Hood, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's conviction for participation in methamphetamine manufacturing and possession of methamphetamine manufacturing materials affirmed where: the State proved his guilt beyond a reasonable doubt, he knowingly and understandingly waived his right to a jury trial, and the court's judgment was supported by proper evidence. Defendant's sentence affirmed where the court considered relevant aggravating and mitigating factors and did not impose an excessive prison term.

¶ 2        Following a bench trial, defendant Douglas Johnson was convicted of participation in methamphetamine manufacturing and possession of methamphetamine manufacturing materials and was sentenced to 11 years' imprisonment. He appeals his conviction and the sentence imposed thereon, arguing: (1) the State failed to prove his guilt beyond a reasonable doubt; (2) he did not knowingly and understandingly waive his right to a jury trial; (3) the court improperly considered hearsay evidence and incorrectly recalled forensic evidence when finding him guilty; and (4) his 11-year sentence is excessive. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3        BACKGROUND

¶ 4        On May 16, 2017, defendant, who had a history of drug addiction, was arrested on his parents' property. During a search of the property, police officers found methamphetamine paraphernalia and materials. As a result, defendant was charged with a number of offenses including participation in methamphetamine manufacturing (720 ILCS 646/15 (2016)) and possession of methamphetamine manufacturing materials (720 ILCS 646/30 (West 2016)).[1]

¶ 5        Defendant signed a written jury waiver form, which the circuit court accepted, and the cause proceeded to a bench trial. At trial, defendant's father, Forrest Johnson, testified that on May 16, 2017, he was residing in Morton Grove with his wife, Jaqueline. At that time, defendant was living in a "huge container storage box" located behind a storage shed in northeastern corner of their backyard. Forrest explained that approximately one month earlier, he and his wife had taken defendant, against whom they had obtained an order of protection, out to dinner. During the dinner defendant, who was homeless, told his parents that he was cold and "soaking wet all the time from

_____

[1] Defendant was also charged with resisting arrest and violating an order of protection. Although he was ultimately found guilty of all charges, no sentences were imposed on those offenses and they are not relevant to this appeal.

the rain," and was being bitten by animals. After defendant's revelations, Forrest "thought with [his] heart instead of [his] brain" and invited defendant to live in the storage box situated in their backyard even though the arrangement violated the order of protection. Defendant was not permitted inside their home, however, and Forrest agreed to stay away from the storage container box while defendant was living there. Defendant was the only individual that Forrest gave permission to spend time in the backyard.

¶ 6     Shortly before May 16, 2017, Forrest's wife became concerned about defendant's behavior and asked him to leave their property. Thereafter, on May 16, 2017, Forrest observed defendant sleeping on a swing located several feet away from their house even though he no longer had permission to be on their property. At that point, Forrest testified that could not "take it anymore" and could not bear to see defendant "trying to kill himself slowly in front of [him]." He and his wife spoke to the drug counselor they had been seeing for the past two years to cope with their son's addiction and the counselor advised them to contact the police and have defendant arrested. Forrest and his wife followed the counselor's recommendation and spoke to two Morton Grove police officers. Forrest explained to the officers that he had permitted defendant to live on their property notwithstanding the order of protection, but that he thought defendant was "doing meth," and that he could not take it anymore. Following their conversation, the officers agreed to arrest defendant. Forrest and Jacqueline returned to their property after the officers advised them that defendant had been arrested.

¶ 7     Forrest was shown several photographs taken of his backyard, including the shed and storage container situated thereon. He testified that a number of the items found in and around the storage container did not belong to him, including lighter fluid, a wire, a glove, a wire cutter, a wrench, a syringe, a plastic bag, a pill container, a bottle, coffee filters, and batteries.

¶ 8    On cross-examination, Forrest testified that his property backed up to several businesses located on Waukegan Road and that there had been several incidences where trucks from those businesses knocked down the fence that enclosed a portion of his backyard. He explained that his "driveway is open" but that "the rest of yard's fenced in with two gates that have locks on them." Forrest admitted that he was not present when his wife told defendant to leave their property and did not recall whether he personally made the same request of his son. He also acknowledged that he regularly observed defendant sleeping in the swing located near the house during his stay. Forrest further testified that that he took good care of his property and mowed and edged it regularly; however, he did not tend to the area where the shed and storage container were located while defendant was residing there.

¶ 9    Morton Grove police officer Daniel Dahm testified that he was one of the officers who spoke to the Johnsons on May 16, 2017, about defendant. They relayed that had been letting defendant stay in their backyard notwithstanding an existing order of protection; however, they explained that they had observed a change in defendant's behavior and that they no longer wanted him on their property. After Officer Dahm verified that defendant's parents had a valid active order of protection against him, he relocated to the Johnsons' property with three other officers. Upon arriving at the property, the officers observed defendant sleeping in a swing in the backyard. No one else was present on the property. After one of the officers woke defendant, Officer Dahm informed him that he was under arrest for violating an order of protection and handcuffed him. He then secured defendant in the back of his squad car.

¶ 10   Afterwards, Officer Dahm and one of his partners, Officer Walsh, walked around the backyard to "check the area." When they did so, he observed some "supplies such as batteries, some tubing, and lighter fluid" that "seemed out of place." Based on his training and experience,

Officer Dahm believed that defendant "could be [using those supplies to] cook[] methamphetamine." He explained that the supplies were not scattered throughout the backyard; rather, they were concentrated in the "northeast corner of the backyard," where a shed and storage container were located. As a result, Officer Dahm contacted Commander Paul Yaras and relayed that he had observed possible evidence of a methamphetamine lab on the Johnsons' property.

¶ 11 Officer Dahm was shown several pictures of the Johnsons' backyard and identified several items that led him to suspect the presence of a meth lab, including batteries, a needle, lighter fluid, funnels, coffee filters, and "crunched up" water bottles. He explained that he had received "very basic training" about methamphetamine use and methamphetamine manufacturing during his tenure as a police officer and knew that items such as coffee filters, batteries, water bottles, and funnels were commonly used in methamphetamine labs. He reiterated that all the items that alerted him to the possibility of the presence of a methamphetamine lab were concentrated in one relatively small area of the Johnsons' yard and were not scattered throughout the property.

¶ 12 On cross-examination, Officer Dahm admitted that none of the aforementioned suspect methamphetamine manufacturing items were found on defendant's person. Moreover, none of those items were located within an arms-length of the swing on which the officers had found defendant sleeping; rather, they were located near the shed and storage container that were in the northeast corner of the Johnsons' backyard.

¶ 13 Commander Yaras testified that he arrived at the Johnsons' property shortly after Officer Dahm advised him about the possible discovery of a methamphetamine lab on the property. When he arrived at that location, Officer Dahm directed him to a corner of the yard containing two storage structures. When he walked over to that portion of the backyard, he observed a bag

hanging on the fence, "some hoses," water bottles, "a couple buckets on the ground next to the shed," "some plastic refuse on the ground," "some more bags," and several additional plastic containers, one of which was coated with a "white-powdery substance." Commander Yaras also noticed a "potent" "chemical-type smell" in the area and "a couple discarded batteries." Because he had received "some training" about methamphetamine manufacturing, he knew that the items and smell he noticed were consistent with the existence of a methamphetamine lab. As a result, he radioed dispatch and requested a "hazardous material response" and several firefighters responded to the scene. After one of the firefighters relayed their findings to him, Commander Yaras turned the case over to Detective Anthony Anderson and Officer Patrick Mallaney.

¶ 14    Detective Anderson, a member of the Illinois State Police Narcotics and Currency Interdiction Task Force (NARCINT), detailed his experience with methamphetamine investigations and his familiarity with issues pertaining to the manufacture, transportation, and sale of methamphetamine. He confirmed that he responded to Commander Yaras's call about a potential methamphetamine lab on the Johnsons' property on May 16, 2017. When he arrived at that location, Detective Anderson observed various items scattered around a shed located in a corner of the yard, including solvents, heat sources, lighter fluid, tubing, and bottles, which in his training and experience appeared to be "HCL generators or one-pot meths." Based on his observations, he "determined at that point it was a methamphetamine lab" and contacted his NARCINT boss and the Illinois State Police's methamphetamine response team. Sergeant Keith Chestnut and Sergeant Don Clark arrived in response to his call. Both men had experience in "mitigating" scenes that contained methamphetamine labs. When they arrived, they collected evidence from the Johnsons' backyard. They turned over two hypodermic needles to Detective Anderson's partner and put other methamphetamine-related materials into various containers.

¶ 15    Sergeant Chestnut, a member of the Illinois State Police's narcotics task force and methamphetamine response team, provided testimony about the training he received concerning the identification, mitigation, and disposal of methamphetamine components and was certified as an "expert in the field of methamphetamine identification and methamphetamine manufacturing." He testified that he and Sergeant Clark responded to a call about a methamphetamine lab discovered on the Johnsons' property. When they arrived at the scene, they donned safety equipment because methamphetamine labs pose a "number of inhalation hazards." After donning respirators and nitrile gloves, they approached a shed located in the yard and observed "[n]umerous components commonly used in meth labs," scattered nearby, including several plastic bottles used as "cooking vessels," tubing, a funnel, coffee filters, bottles of sulfuric acid, and a bottle of lye. He explained how those items were used to manufacture methamphetamine using the "one-pot method." After observing those items, Sergeant Chestnut testified that he knew "without a doubt" that he was in the presence of a methamphetamine lab. He then made a list of the methamphetamine manufacturing components that he observed at the scene and determined which items were considered HAZMAT materials that needed to be disposed of in a HAZMAT bunker and which items could be collected and processed as evidence. He viewed photographs taken of the scene and identified various items that were collected and processed.

¶ 16    Sergeant Chestnut acknowledged that he did not find evidence of pseudoephedrine, a necessary component to manufacture methamphetamine, at the scene. He explained, however, the methamphetamine addicts typically purchase pseudoephedrine at drug stores and then immediately use it to cook methamphetamine. Because the purchase of pseudoephedrine is regulated, it is difficult to purchase large quantities, and as such, it is not unusual for him not to find

pseudoephedrine at clandestine methamphetamine labs. He also acknowledged that a number of items that he found at the scene were common household items, including plastic bottles and coffee filters; however, he explained that the accumulation of all the items left him with no doubt that the materials he found in the Johnsons' backyard were used to manufacture methamphetamine.

¶ 17    Gina Romano, a forensic scientist at the Northeastern Illinois Regional Crime Lab and an expert in the field of forensic chemistry, testified that she was assigned to analyze materials collected from the Johnsons' backyard, including two syringes. She performed tests accepted in the field on one of those syringes and concluded that the residue in that syringe contained methamphetamine. Because she was testing residue, she recorded no measurable weight of the drug.

¶ 18    Following Romano's testimony, the parties stipulated that a proper chain of custody had been maintained with respect to the syringes from the time they were recovered from the Johnsons' backyard to the time they were sent to the Illinois State Police Crime Lab.

¶ 19    After presenting the aforementioned evidence, the State rested its case. Defendant moved for a directed verdict, but the motion was denied. Thereafter, defendant informed the court that he had elected not to testify and the defense rested without presenting any evidence. The cause was continued, and at the next court date, the parties delivered closing arguments. After considering the evidence presented and the arguments of the parties, the court found defendant guilty of possession of methamphetamine manufacturing materials and participation in methamphetamine manufacturing. In doing so, the court noted that it had found the testimony of the law enforcement officers involved in the case to be "very credible" and the testimony of defendant's father to be "extremely credible." The court based its finding of guilt on that fact that defendant had "control

over an approximate 50 square-foot area in the backyard," which was the area that law enforcement officials characterized as a "meth lab."

¶ 20    Defendant's posttrial motion was denied and the cause proceeded to a sentencing hearing where the parties presented evidence in aggravation and mitigation. In aggravation, the State noted that defendant was "class X mandatory for sentencing" due to his prior criminal background and was thus subject to a sentence of 6 to 30 years' imprisonment. The State requested the court to impose a "significant" sentence on defendant given the fact that his meth lab put his "parents' lives and property at risk" and posed a risk to everyone else in the "surrounding community." In mitigation, the defense noted that defendant had been receiving treatment at Westcare, a substance abuse treatment center, for the past 10 months and had been attending AA meetings while in jail. Although defense counsel acknowledged defendant was subject to Class X sentencing, he requested "something closer to six than the higher end." The court was presented with letters written by defendant's family members on his behalf and defendant delivered a statement in allocution in which he acknowledged his "pretty significant" criminal history and explained that it was "an unfortunate byproduct of addiction and really bad choices." He also acknowledged that he "need[ed] to be punished for what he did," but emphasized that he "never meant to hurt anybody" and asked the court for "mercy." After considering the aggravating and mitigating evidence, the court sentenced defendant to 11 years' imprisonment. In doing so, the court found that "it was not fair to the rest of the people in the community to sentence [him] to the minimum," but indicated that it did not believe that defendant was a "20 to 30 guy either." The court explained that for the purposes of sentencing, "Count 2 [possession of methamphetamine manufacturing material] merges with Count 1 [participation in methamphetamine manufacturing]," and thus the

sentencing order reflects that defendant was sentenced to 11 years' imprisonment for participation in methamphetamine manufacturing.

¶ 21      Defendant's motion to reconsider his sentence was denied and this appeal followed.

¶ 22      ANALYSIS

¶ 23      A.  Sufficiency of the Evidence

¶ 24      On appeal, defendant first challenges the sufficiency of the evidence.  Specifically, he argues that the State failed to prove him guilty of possession of methamphetamine manufacturing materials "where he was not in actual possession of the materials or in constructive possession where he was arrested while sleeping on the other side of the yard at a distance from the materials."  He further argues that the State also failed to prove him guilty of participating in methamphetamine manufacturing "where there was no evidence that [he] took any physical action, or participated, in the production of methamphetamine."

¶ 25      The State, in turn, initially responds that "there is no basis to review" defendant's sufficiency of the evidence challenge pertaining to his possession of methamphetamine manufacturing materials conviction because the circuit court did not impose a sentence on that offense; rather, the court merged the two methamphetamine-related offenses and only imposed a sentence on the participation in methamphetamine manufacturing offense.  On the merits, the State submits that "overwhelming evidence" established his guilty of both offenses.  That is, the State argues that the evidence "affirmatively established defendant's knowledge of and exclusive control over the meth lab discovered behind his parents' shed.  Moreover, defendant's knowing participation in the meth lab's production of methamphetamine was properly inferred from his constructive possession of the meth lab and his own guilty conduct."

¶ 26       As a threshold matter, we note that it is well-established that where no sentence is imposed on a charge following a finding of guilt, there is no final order. *People v. Relerford*, 2017 IL 121094, ¶ 71; *People v. Profit*, 2021 IL App (1st) 170744, ¶ 35. Based on the record, it is evident that the circuit court concluded that possession of methamphetamine manufacturing materials was a lesser offense of participation in methamphetamine manufacturing. As a result, the court merged the two offenses and only imposed the 11-year sentence on the participation in methamphetamine manufacturing offense. Nonetheless, as will be discussed below, given the overlap in evidence that the State used to establish that defendant both possessed methamphetamine manufacturing materials and participated in the manufacture of the drug, we find that the evidence was sufficient to establish defendant's guilt of both offenses.

¶ 27       Due process requires proof beyond a reasonable doubt to convict a criminal defendant. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). In reviewing a challenge to the sufficiency of the evidence, it is not a reviewing court's role to retry the defendant; rather, the court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt. *People v. Ward*, 215 Ill. 2d 317, 322 (2005); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 58. This standard is applicable to all criminal cases regardless of the nature of the evidence at issue. *People v. Bush*, 214 Ill. 2d 318, 327 (2005). In a bench trial, the trial court is responsible for evaluating the credibility of the witnesses, resolving conflicts and inconsistencies in the evidence, and determining the weight to afford, and the inferences to be drawn, from the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the trier of fact is not required to disregard reasonable inferences that flow from the evidence or seek out all possible explanations to support a defendant's claim of innocence. *People v. Maldonado*,

2015 IL App (1st) 131874, ¶ 18. Ultimately, a reviewing court may not substitute its judgment for that of the trier of fact (*People v. Campbell*, 146 Ill. 2d 363, 375 (1992)) and will not reverse a defendant's conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 28        Section 30 of the Methamphetamine Control and Community Protection Act (Methamphetamine Act or Act) prohibits an individual from "knowingly engag[ing] in the possession, procurement, transportation, storage or delivery of any methamphetamine manufacturing material *** with the intent that it be used to manufacture methamphetamine." 720 ILCS 646/30(a) (West 2016). Methamphetamine manufacturing material includes "any methamphetamine precursor, substance containing any methamphetamine precursor, methamphetamine manufacturing catalyst, substance containing any methamphetamine manufacturing catalyst, methamphetamine manufacturing reagent, substance containing any methamphetamine manufacturing reagent, methamphetamine manufacturing solvent, substance containing any methamphetamine manufacturing solvent, or any chemical, substance, ingredient, equipment, apparatus, or item that is being used, has been used, or is intended to be used in the manufacture of methamphetamine." 720 ILCS 646/10 (West 2016).

¶ 29        Section 15 of the Act, in turn, prohibits an individual from "knowingly participat[ing] in the manufacture of methamphetamine with the intent that methamphetamine or a substance containing methamphetamine be produced." 720 ILCS 646/15(a)(1) (West 2016). The Act provides that " 'participation' in the manufacture of methamphetamine means to produce, prepare, compound, convert, process, synthesize, concentrate, purify, separate, extract, or package any methamphetamine, methamphetamine precursor, methamphetamine manufacturing catalyst, methamphetamine manufacturing reagent, methamphetamine manufacturing solvent, or

any substance containing any of the foregoing, or to assist in any of these actions, or to attempt to take any of these actions, regardless of whether this action or these actions result in the production of finished methamphetamine." 720 ILCS 646/10 (West 2016). Accordingly, "[u]nder the plain language of the Act, one can be guilty of participating in the manufacture of methamphetamine merely by *assisting* in the production of methamphetamine. This assistance could occur in many forms such as (1) supplying the raw materials to manufacture methamphetamine; (2) providing the knowledge, equipment, or capital to manufacture methamphetamine; or (3) consenting to the manufacture of methamphetamine on [one's] property." *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 43.

¶ 30     In this case, the testimony at trial established that law enforcement officials recovered items used to produce methamphetamine via the "one pot" method in the Johnsons' backyard. Specifically, Officer Dahm, Detective Anderson, and Sergeant Chestnut testified that they discovered batteries, tubing, plastic bottles, coffee filters, funnels, sulfuric acid, and lye at the scene. Although many of those items were "basic common household materials," Sergeant Chestnut, who was qualified to testify as an expert in methamphetamine identification and manufacturing, explained that the "combination" and "accumulation" of those materials made the scene a methamphetamine manufacturing lab. In addition to those items, Commander Yaras detected a "chemical-type smell" consistent with methamphetamine production emanating from the area in which the aforementioned methamphetamine manufacturing materials were found. Law enforcement officials also recovered two syringes from the Johnson's backyard and forensic scientist Gina Romano tested the residue contained in one of those syringes and confirmed that it contained methamphetamine. Defendant does not dispute that methamphetamine and methamphetamine manufacturing materials were recovered from his parent's backyard; instead,

his challenge to the sufficiency of the evidence is that the State failed to prove that he constructively possessed those materials and used them to participate in methamphetamine manufacturing.

¶ 31     The element of possession requires evidence that the defendant had knowledge of the presence of the narcotics and had " 'immediate and exclusive control' " over them. *People v. Scott*, 2012 IL App (4th) 100304, ¶ 19 (quoting *People v. Morrison*, 178 Ill. App. 3d 76, 90 (1988)). Possession can be actual or constructive. *Id.* Actual possession exists where a defendant " 'exhibits some form of dominion over the unlawful substance, such as trying to conceal it or throw it away.' " *Id.* Constructive possession, in contrast, occurs when a "defendant exercises 'no actual personal present dominion over the narcotics," but evidences an " 'intent and capability to maintain control' " over them. *Id.* "For example, '[w]here narcotics are found on the premises rather than on a defendant, constructive possession may be inferred from facts showing that he once had physical control with intent to exercise control in his own behalf, he has not abandoned the drugs and no other person has obtained possession.' " *Id.* (quoting *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002)). The exclusive dominion and control necessary to establish constructive possession is not diminished by the mere fact that others had access to the contraband. *People v. Givens*, 237 Ill. 2d 311, 338 (2010). Constructive possession is rarely proven by direct evidence; rather, it is generally "proven entirely by circumstantial evidence." *Maldonado*, 2015 IL App (1st) 131874, ¶ 23. Although a defendant's "mere proximity" to contraband is insufficient, standing alone, to establish that he had the requisite control of the items necessary to support a finding of constructive possession (*People v. Ray*, 232 Ill. App. 3d 459, 462 (1992)), "where the other circumstantial evidence is sufficiently probative, proof of proximity combined with inferred knowledge of the presence of contraband

will support a finding of guilt on charges of possession" (*People v. Brown*, 277 Ill. App. 3d 989, 998 (1996)).

¶ 32    In this case, there is no dispute that defendant did not have actual possession of the methamphetamine or the materials used to manufacture methamphetamine at the time of his arrest. Officer Dahm testified that when he arrived on the Johnsons' property, he found defendant sleeping on a swing located close the house. The methamphetamine and methamphetamine manufacturing materials, however, were found in the northeast corner of the backyard, approximately 70 feet away from where defendant was found sleeping. Although defendant is correct hat his "mere proximity" to those items is insufficient to establish that he constructively possessed those materials (*Ray*, 232 Ill. App. 3d at 462), the State's evidence against him was not limited to his mere proximity to those items; rather, the totality of the circumstantial evidence that the State presented at trial established that defendant had the requisite knowledge and control over those items to support a finding of constructive possession.

¶ 33    Notably, Forrest testified that when he and his wife allowed defendant to stay on their property, defendant was not permitted in their house; rather, he was afforded access to the northeast corner of the backyard where a shed and a 7-foot long storage container were located. Defendant used a blanket to make a "bed" in the container, which was located behind the shed. Forrest further testified that he agreed to stay away from the area of the yard where the storage container was located while defendant was staying on the property and confirmed that he "d[idn't] go back there" and "stayed away" from that area when he mowed and tended to the rest of his property. Forrest's testimony about the living arrangement with his son established that defendant had control over the northeast corner of the yard, which was the same area of the yard that law enforcement officials recovered the methamphetamine manufacturing materials at issue.

See *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 17 (recognizing that "[c]onstructive possession exists" where "the defendant has control over the area where the contraband was found"). As explained, above, the officers testified that the plastic bottles, funnels, batteries, tubing, and solvents were all recovered behind the shed and in and around the storage container. They also observed a blanket and clothing in the storage container, which corroborated Forrest's account of defendant's living arrangement. Although defendant is correct that nothing bearing his name was recovered from the storage container, the fact that items purportedly belonging to him, including the blanket that Forrest identified as defendant's bedding, were located in close proximity to the methamphetamine manufacturing materials provides further support that he had constructive possession of those items. See, *e.g., People v. McCoy*, 295 Ill. App. 3d 988, 994-95 (1998) (finding that the State presented sufficient evidence that the defendant was in constructive possession of narcotics, based in part, on the fact that several of his personal items were located in the same area of the residence where the narcotics were recovered). Law enforcement officials also corroborated Forrest's testimony that he stayed away from the northeast corner of his yard while defendant was residing there. They noted that the yard was well-tended except for the northeastern corner where the methamphetamine manufacturing materials were scattered. Ultimately, reviewing the evidence in the light most favorable to the State (*Ward*, 215 Ill. 2d at 322), we find that the State presented sufficient evidence to establish that defendant was in constructive possession of the methamphetamine manufacturing materials at issue.

¶ 34    Moreover, the chemical smell detected on the northeastern corner of the Johnsons' property, the presence of residue in plastic bottles, and the fact that a syringe found in the vicinity of the storage container contained methamphetamine, all provide evidentiary support that the methamphetamine manufacturing materials that defendant constructively possessed were in fact

used to manufacture methamphetamine. The evidence was likewise sufficient to establish that defendant participated in methamphetamine manufacturing. As explained above, pursuant to the Methamphetamine Act, a defendant may be found guilty of participating in methamphetamine manufacturing by supplying raw materials, knowledge, and equipment used to produce the drug. *Marzonie*, 2018 IL App (4th) 160107, ¶ 43. Given his constructive possession of the aforementioned methamphetamine manufacturing materials and equipment as well as evidence that methamphetamine was manufactured in the corner of the yard over which he had control, we find that the State presented sufficient evidence that defendant participated in methamphetamine manufacturing. We therefore reject defendant's challenge to the sufficiency of the evidence.

¶ 35     B.  Jury Waiver

¶ 36     Defendant next argues that he "did not understandingly waive his constitutional right to a jury trial where the record indicates that the court only made a perfunctory inquiry into [his] signed jury waiver and failed to admonish him about his right to a jury trial on the felony charges against him."

¶ 37     The State responds that defendant's claim lacks merit where the record shows that he "was represented by counsel, spoke with counsel about his decision to waive his right to a jury trial, executed a written jury waiver, and told the court that he had no questions about his right to a jury trial."

¶ 38     As a threshold matter, defendant acknowledges that he failed to raise this issue in the circuit court and thus failed to properly preserve this claim for appellate review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (recognizing that to properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion and that his failure to satisfy both requirements results in forfeiture of appellate review of his

claim). In an effort to avoid forfeiture, however, defendant invokes the plain error doctrine, which provides a limited exception to the forfeiture rule and allows for review of forfeited issues on appeal if the evidence is closely balanced or the error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of his right to a fair trial. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Belknap*, 2014 IL 117094, ¶ 48; *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first step in any plain error analysis is to determine whether any error actually occurred. *Piatkowski*, 225 Ill. 2d at 565; *People v. Rinehart*, 2012 IL 111719, ¶ 15. If an error is discovered, defendant then bears the burden of persuasion to show that the error prejudiced him. *Sargent*, 239 Ill. 2d at 189-90. Keeping this standard in mind, we turn now to evaluate the merit of defendant's claim.

¶ 39       A criminal defendant's right to a jury trial is one that is guaranteed by both the federal and Illinois State constitutions. U.S. Const. amends., VI, XIV; Ill. Const. 1970, art. I, § 8, § 13. The right to a jury is also codified in section 115-1 of the Illinois Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/115-1 (West 2016)). Nonetheless, it is well-settled that a criminal defendant may waive his right to a jury and elect to proceed by way of a bench trial as long as the waiver is made knowingly and understandingly in open court. 725 ILCS 5/103-6 (2016) ("Every person accused of an offense, shall have the right to a trial by a jury unless *** understandingly waived by the defendant in open court"); *People v. Bannister*, 232 Ill. 2d 65-66 (2008). Although a court has a duty to ensure that ensure that a defendant's jury trial waiver is knowingly and understandingly made, the court is not required to impart to the defendant a specific set of admonishments or advise the defendant of the consequences of his waiver. *Bannister*, 232 Ill. 2d at 66; *People v. Harper*, 2017 IL App (4th) 150045, ¶ 31. Ultimately, the validity of a jury waiver

is not dependent upon any specific formula; rather it is dependent upon the unique facts and circumstances of each case. *Bannister*, 232 Ill. 2d at 66; *Harper*, 2017 IL App (4th) 150045, ¶ 31. As a general rule, however, courts have consistently held that a jury waiver is valid if there is an express statement by defense counsel, in the defendant's presence and without the defendant's objection, indicating that his client has been informed of his rights and had decided to forgo his right to a jury trial. See, *e.g., People v. Bracey*, 213 Ill. 2d 265, 270 (2004); *People v. West*, 2017 IL App (1st) 143632, ¶ 10. Ultimately, it is the burden of a defendant challenging validity of his jury waiver to prove that the waiver made absent the requisite knowledge and understanding. *People v. Parker,* 2016 IL App (1st) 141597; *People v. Reed,* 2016 IL App (1st) 140498, ¶ 7.

¶ 40    In this case, the record reflects that prior to the start of trial, defense counsel apprised the court that defendant had "signed a written jury waiver just moments ago in the courtroom." The written waiver was then submitted to the court. Upon receipt of defendant's signed written waiver, the circuit court addressed defendant in open court as follows:

> "THE COURT: Okay. Mr. Johnson, I have a document in front of me, and it looks to be a waiver of your jury trial rights. Is that your signature in the middle of that document?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Okay. And by signing it, you're formally telling me why you are giving up your right to a jury trial; is that correct?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Have you talked to your lawyer, Mr. Siegel, about that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you have any questions about it?
>
> THE DEFENDANT: No, sir.

THE COURT: Okay. Jury trial waiver accepted."

¶ 41    Our review of the record rebuts defendant's argument that his jury waiver was not made knowingly and understandingly. As explained above, defendant executed a signed document waiving his right to a jury trial. Although not dispositive, courts have recognized that the existence of a " 'signed jury waiver *** lessens the probability that the waiver was not made knowingly.' " *People v. Rincon*, 387 Ill. App. 3d 708, 720 (2008) (quoting *People v. Steiger*, 208 Ill. App. 3d 208 Ill. App. 3d 979, 982 (1991)). Moreover, in response to questioning by the court, defendant expressly acknowledged that he discussed the jury waiver with his attorney and denied that he had any questions about the waiver.

¶ 42    Although defendant acknowledges these facts, he argues that his waiver was not made with the requisite knowledge and understanding due to the court's failure to specifically admonish him about the nature of jury trials and the significance of foregoing the right to such a trial. For example, he notes that the court did not specifically advise him of the difference between a bench trial and a jury trial, did not apprise him of the makeup of a jury or the manner in which its members would be chosen, and did not inform him that a jury would have to reach a unanimous decision to convict him of the offenses with which he was charged. We acknowledge no such admonishments were provided; however, defendant's argument that the lack of such admonishments rendered his waiver invalid fails to accord with established legal precedent that recognizes that a court is not required to impart to the defendant a specific set of admonishments or advise the defendant of the consequences of his waiver for a jury waiver to be valid. *Bannister*, 232 Ill. 2d at 66; *Harper*, 2017 IL App (4th) 150045, ¶ 31. Indeed, although courts have recognized that claims of error with respect to jury waivers could be avoided by providing such admonishments in open court, they have routinely recognized that the lack of such admonishments does not render a defendant's jury

waiver unknowing and involuntary. See, *e.g.*, *People v. West*, 2017 IL App (1st) 143632, ¶¶ 15-16 (observing that admonishments delivered in open court could eliminate claims of error regarding the validity of jury waivers, but rejecting the defendant's claim that the trial court's failure to provide such admonishments rendered his jury waiver invalid because no specific admonishments are required). Similarly, the mere fact that the court did not inquire whether defendant's jury waiver stemmed from any promise or threat or explain that the waiver applied to each one of the charges against him is insufficient to undermine the validity of that waiver. See, *e.g.*, *Id.* ¶ 12 (finding that the trial court's lack of inquiry as to whether the defendant's jury waiver resulted from any threat or promise did not invalidate the waiver); *Parker*, 2016 IL App (1st) 141597, ¶ 51 (rejecting the defendant's suggestion that his waiver was invalid and made absent knowledge and understanding that it applied to all of the charges against him where there was "no indication in the record that the discussion regarding his jury waiver related to only a portion of the case against him"). Ultimately, given that defendant submitted a written jury waiver, acknowledged discussing the matter with his attorney, and did not express any doubts or ask any questions when afforded the opportunity to do so, we conclude that defendant's jury waiver was made knowingly, understandingly, and voluntarily.

¶ 43       In so holding, we find defendant's reliance on *People v. Sebag*, 110 Ill. App. 3d 821 (1982) unavailing. In that case, a *pro se* defendant waived his right to a jury trial following a brief colloquy with the trial court wherein the court informed him that he was entitled to a trial by judge or jury and the defendant responded he wanted a trial before a "judge." *Id.* at 828-29. The court then informed the defendant that he could not reinstate his right to a jury trial after waiving that right and the defendant responded that he understood. *Id.* On appeal, the Second District found that this brief exchange was insufficient to establish that the defendant knowingly waived

his right to a jury trial, reasoning that he "was without benefit of counsel, and it does not appear that he was advised of the meaning of a trial by jury nor does it appear that he was familiar with criminal proceedings." *Id.* at 829. Here, in contrast, defendant was represented by counsel and indicated that he had conferred with his attorney prior to executing the written jury waiver. Moreover, when afforded the opportunity to ask any questions about the waiver and its effect, defendant declined to do so. Therefore, we do not find that *Sebag* compels a different result; rather, we find that defendant knowingly and understandingly waived his right to a jury trial. Having found no error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18; *Parker*, 2016 IL App (1st) 141597, ¶ 53.

¶ 44      Circuit Court's Ruling

¶ 45      Defendant next argues that he is entitled to a new trial because the trial court's judgment was premised on its erroneous reliance on hearsay evidence as well as its misapprehension of the relevant forensic evidence.

¶ 46      The State, in turn, refutes defendant's characterization of the evidence that informed the circuit court's judgment and argues that the circuit court neither relied on hearsay evidence nor erroneously recalled forensic evidence.

¶ 47      Defendant again acknowledges that he failed to properly preserve these claims for appellate review and again invokes the plain error doctrine. We must first determine whether an error occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 48      Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it falls within a specifically recognized exception. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *Caffey*, 205 Ill. 2d at 88; *People v. Lawler*, 142 Ill. 2d 548, 557 (1991); *People v. Wright*, 2013 IL App (1st) 103232, ¶ 73. Testimony concerning an out-of-

court statement that is utilized for a purpose other than to prove the truth of the matter asserted does not constitute hearsay. *People v. Sims*, 143 Ill. 2d 154, 173-74 (1991). The general prohibition of hearsay evidence exists because there is no opportunity to cross-examine the declarant and therefore the admission of such evidence violates a defendant's constitutionally protected right to confrontation. U. S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007); *People v. Jura*, 352 Ill. App. 3d 1090, 1085 (2004). Hearsay evidence is not considered competent substantive evidence and the trial court errs if it considers it as such. *People v. Simpson*, 2015 IL 116512, ¶ 27.

¶ 49    In this case, defendant's father testified at trial about the circumstances that led to defendant's arrest. Specifically, he testified that he and his wife spoke to two Morton Grove police officers after they became concerned about defendant's behavior and his appearance. During that conversation, Forrest relayed that they had permitted defendant to stay in their backyard even though they had obtained an order of protection against him. Forrest, however, told the officers that he thought defendant was "doing meth" and that he "couldn't take" watching defendant "trying to kill himself in front of [him]" any longer. In finding defendant guilty, the circuit court recounted the salient details leading to his arrest and law enforcement's discovery of methamphetamine paraphernalia and manufacturing materials. In doing so, the court observed that several Morton Grove police officers responded to the Johnsons' backyard after Forrest told them that he "had concerns over his son using meth, and he could no longer watch his son, in his words, kill himself in the backyard." The court then remarked, "the word meth comes long before the police get there. The methamphetamine part of this equation is in this case long before *** the police arrive at the Johnson residence."

¶ 50 The State suggests that Forrest's testimony did not involve an out-of-court statement; rather, he simply explained his observations and his motivation for having his son arrested. Although it is true that a witness's testimony about his personal observations does not constitute an out-of-court statement or inadmissible hearsay (see *Village Discount Outlet v. Dept. of Employment Security*, 384 Ill. App. 3d 522, 525 (2008) (citing *People v. Tharpe-Williams*, 286 Ill. App. 3d 605, 609 (1997)), there is no dispute that Forrest discussed his observations and his belief that defendant was "using meth" when detailing the out-of-court conversation he had with Morton Grove police officers that led to his son's arrest.

¶ 51 Although improper, evidence of defendant's use and possession of methamphetamine and methamphetamine manufacturing materials was not limited to Forrest's out-of-court statement to law enforcement officials. As set forth above, despite defendant's suggestion that the evidence against him was "closely balanced," there was an abundance of evidence that defendant constructively possessed methamphetamine manufacturing materials and participated in methamphetamine manufacturing. Importantly, methamphetamine and methamphetamine manufacturing materials were recovered from a specific area of the Johnsons' backyard, *i.e.*, the northeast corner of the yard where a shed and storage container were located. At trial, Forrest explained that when he and his wife initially permitted defendant on their property, he was precluded from entering the residence; rather, he was permitted access to the 7-foot-long storage container located behind the shed. Defendant created a "bed" in the container with a blanket. Forrest, in turn, agreed that he would not access that area of that yard while defendant resided there and testified that he honored that agreement and "stayed away" from that portion of his yard during defendant's stay. Forrest's account of these living arrangements was corroborated by the observations made by law enforcement officials at the scene. Those officials observed a

blanket and men's clothing in the storage container and found that the yard was in good condition except for the northeast corner of the property where methamphetamine manufacturing materials were scattered behind the shed. Although we acknowledge that the State did not present any DNA or fingerprint evidence connecting defendant to the methamphetamine manufacturing materials, we do not find that the evidence against him was closely balanced given the multitude of circumstantial evidence connecting him to the materials and their use in methamphetamine manufacturing. See, *e.g., People v. Belknap*, 2014 IL 117094, ¶ 56 (rejecting the defendant's claim that the evidence against him was closely balanced where strong circumstantial evidence "pointed to [him] as the perpetrator" and excluded any reasonable possibility that anyone else was guilty of the crime). Therefore, we find that the plain error doctrine does not apply. Moreover, given defendant's inability to show that the error prejudiced him, his alternative claim that his attorney was ineffective for failing to object to the hearsay evidence and properly preserve this claim also necessarily fails. See *People v. White*, 2011 IL 109689, ¶ 134.

¶ 52       Next, defendant argues that the circuit court "misapprehended" and "inaccurately recalled" relevant forensic evidence.

¶ 53       As set forth above, in a bench trial, the circuit court is responsible for evaluating the evidence. *Siguenza-Brito*, 235 Ill. 2d at 228. In doing so, the court is permitted to draw reasonable inferences from the evidence and determine the weight to afford that evidence. *Id.* It is presumed that the trial court accurately recalled and properly considered competent evidence and this presumption will only be rebutted by affirmative evidence to the contrary. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 28; *People v. Williams*, 2013 IL App (1st) 111116, ¶ 102. Where it is evident that the circuit court failed to properly recall and consider evidence critical to

the defense, a defendant's constitutional right to due process is violated. *Id.* ¶ 75 (citing *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992)).

¶ 54    Defendant's claim that the circuit court improperly recalled forensic evidence is based on the court's statement that the "syringes" recovered by law enforcement officers tested "positive for meth." He notes that forensic scientist Gina Romano testified that she only tested the residue contained in one of the two syringes recovered from the Johnsons' property, and argues that the circuit court's use of the plural when describing the forensic evidence reveals a failure to properly recall the relevant evidence. We disagree.

¶ 55    In finding defendant guilty of possession of methamphetamine manufacturing materials and participating in methamphetamine manufacturing, the court made multiple references to the syringes. When discussing Romano's testimony, the court stated as follows: "Jeanne Romano from the Northeast Crime Lab was qualified as an expert and testified that the substance in the *syringe* w[as] meth. And it was established on cross-examination that it was just residue, it's a small amount." (Emphasis added.) Later on, when recounting the items found in the northeast corner of the Johnsons' backyard, the court concluded that the collection of those items including tubing, plastic containers, solvents, coffee filters, funnels and "syringes positive for meth" were evidence of a methamphetamine lab. A fair reading of the record thus shows that the court accurately recalled Romano's forensic testimony and was aware that she only tested one of the two syringes recovered from defendant's methamphetamine lab and that her testing revealed the presence of methamphetamine in that syringe. The court's subsequent use of the plural "syringes" later in its ruling can either be construed as a reasonable inference that the second untested syringe also likely contained methamphetamine or a mere slip of the tongue. Either way, we do not find that the record affirmatively shows that the court completely failed to recall

evidence relevant to the defense and violated defendant's due process rights. See, *e.g., People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107 (rejecting the defendant's claim that his due process rights were violated when the circuit court made an inaccurate statement when engaging in an "extensive discussion of all of the evidence," where the statement did not show that the court fundamentally failed to comprehend the evidence; rather it was more aptly categorized as a " 'slip of the tongue.' "). Indeed, to the extent that the court's discussion of the syringes can be categorized as a misstatement, there is no evidence that the misstatement had any impact on the court's decision-making process given that evidence of defendant's guilt was not limited to the syringes; rather, as explained previously, there was a multitude of evidence that defendant possessed methamphetamine manufacturing materials and participated in methamphetamine manufacturing. Accordingly, we find that defendant's claim that the circuit court violated his due process rights lacks merit.

¶ 56    Excessive Sentence

¶ 57    Lastly, defendant challenges his sentence. He argues that his 11-year sentence is excessive because his criminal conduct stemmed from his "long-standing drug and alcohol addiction," which he was "successfully fighting with treatment prior to trial." Moreover, he argues the trial court failed to properly consider other relevant mitigating factors such as his education and employment history, his familial support, as well as the fact that his criminal history "consist[ed] primarily of non-violent drug offenses [and] crimes committed to support a drug addiction."

¶ 58    The State responds that that the circuit court did not abuse its discretion in sentencing defendant to 11-years' imprisonment because the sentence "was [e]minently reasonable given the toxic danger his conduct posed to the community, first responders, and his own parents" and was "amply supported by his extensive criminal history."

¶ 59     The Illinois Constitution requires a trial court to impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential. Ill. Const. 1970, art. I, §11; *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). To find the proper balance, the trial court must consider a number of aggravating and mitigating factors, including: "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment and education." *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992). The circuit court is not required to explicitly analyze each relevant factor or articulate the basis for the sentence imposed and when mitigating evidence is presented before the trial court, it is presumed that the court considered that evidence in imposing the defendant's sentence. *People v. Averett*, 381 Ill. App. 3d 1001, 1021 (2008); *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004). Because the circuit court is in the best position to weigh the relevant factors, the sentence that it imposes is entitled to great deference and will not be disturbed on appeal absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). As such, when reviewing a defendant's sentence, this court may not substitute its judgment for the trial court merely because it could or would have weighed the factors differently. *People v. Jones*, 376 Ill. App. 3d 372, 394 (2007). Accordingly, when a sentence falls within the applicable statutory guidelines, it is presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010); *Ramos*, 353 Ill. App. 3d at 137.

¶ 60     In this case, because of defendant's criminal history, he was subject to a mandatory Class X sentence of 6 to 30 years' imprisonment. 730 ILCS 5/5-4.5-95(b) (West 2016); 730 ILCS 5/5-4.5-

25(a) (West 2016). There is thus no dispute that the 11-year sentence that the circuit court elected to impose upon him falls within the lower end of the applicable statutory sentencing range and is afforded a presumption of propriety. *Gutierrez*, 402 Ill. App. 3d at 900; *Ramos*, 353 Ill. App. 3d at 137. Although defendant suggests that the sentence ignores his rehabilitative potential and is "particularly inappropriate" given that his criminal conduct "was rooted in his long-standing drug and alcohol problem," the record reveals that the circuit court heard and considered relevant mitigating evidence. In particular, the court noted that defendant had a loving family and that he had an "addiction, *** a sickness." The court also acknowledged that defendant was obtaining addiction treatment and that it had reviewed his treatment records. Although the court acknowledged the existence of mitigating factors, it was troubled that defendant was a repeat offender who had reoffended after serving two prior 6-year sentences and that his most recent conduct put the lives of his family members and the surrounding community at risk. As a result, the court concluded that it was "not fair to the rest of the people in the community to sentence [him] to the minimum;" however, it also indicated that it did not believe that defendant was "20 to 30 guy either." Accordingly, the court elected to sentence him to 11-years' imprisonment.

¶ 61    Given that the record reflects that the court carefully considered the circumstances of the crime and the applicable aggravating and mitigating factors prior to imposing defendant's sentence, we find that defendant has failed to rebut the presumption of propriety afforded to his sentence and has failed to establish that the circuit court abused its discretion and imposed an excessive sentence. Therefore, we affirm defendant's 11-year sentence.

¶ 62    CONCLUSION

¶ 63    The judgment of the circuit court is affirmed.

¶ 64    Affirmed.